## Gertrude Curtis Weston v. The State Mutual Life Assurance Company of Worcester, Massachusetts.

### Gen. No. 13,517.

1. GENERAL ISSUE—*when sufficient in action upon insurance policy.* Where a declaration on an insurance policy states facts concerning an alleged breach of conditions, and attempts to avoid the result, or to anticipate what otherwise would be the pleadings of the defendant in relation thereto, the general issue will be sufficient to form the issues tendered by the declaration.

2. INSURANCE—*when policy lapsed. Held,* under the evidence in this case, that the policy sued upon had lapsed for non-payment of premium; although the policies in question were not policies containing an express, self-executing clause providing for their lapse on non-payment of a premium when it becomes due.

3. DEFENSE—*what is not shifting of ground of.* If the president of the company accurately stated the facts in declaring the position of the company, as to the death claim, the company cannot be said to have shifted the ground of defense, because the president's conclusions of law differed from those advanced at the trial by the company.

4. NOTICE OF LAPSE—*when not required*. Notice to the assured or the lapse of a policy for non-payment of premium is not necessary when the evidence shows an intentional abandonment of the policies on his part.

Assumpsit. Appeal from the Superior Court of Cook county; the Hon. ARTHUR H. FROST, Judge, presiding. Heard in this court at the March term, 1907. Affirmed. Opinion filed December 2, 1907.

**Statement by the Court.** This is an appeal from a judgment of *nil capiat* and for costs of suit rendered in favor of the defendant and against the plaintiff below, respectively the appellee and appellant here. The action was brought in the Superior Court of Cook county in *assumpsit* by the plaintiff, then Gertrude Curtis, against the Assurance Company, on two policies of insurance, each for $3,500, issued in her favor on the life of her deceased husband, Edward S. Curtis. The declaration was in six counts. The first and the fourth counts declared on one of the policies, averring that it was in full force at Curtis's death, and that he in his lifetime performed and fulfilled all the conditions and provisos in said policy contained.

The second and fifth counts each declared on one of the policies, and averred that the policy provided for the payment of a quarter-annual premium of $29.40 during the lifetime of Edward S. Curtis as follows: $29.40 in cash on or before the thirtieth days of June, September, December and March; that at the time of the delivery of said policy the said Edward S. Curtis and the said defendant agreed with each other that the amount to be paid quarterly on said policy should be reduced during the first year of said policy, to wit, until June 30, 1900, from $29.40 to $20.58, and it was also agreed to extend the time for the payment of the said $20.58 until August 24, 1899, and before said last date Curtis delivered to the company his note for the payment of said sum of $20.58, which was accepted by the company as full payment for said first payment, and which with the payments for September

30th and December 30, 1899, of $20.58 each were extended by the defendant to February 14, 1900; that said note and agreement were accepted and received by the defendant company in settlement of the premium payable in June, September and December, 1899; that Curtis died January 31, 1900, while the policy was in force, and that in his lifetime he fulfilled all the stipulations in said policy contained, except such as had been waived by the defendant.

The third and sixth counts each declared on one policy, and are more specifically drawn as to the fulfillment of conditions by the assured. Each avers that Curtis in his lifetime performed the stipulations of the policy, except that at the time of his death the said Edward S. Curtis had not paid in cash the said several premiums reduced by the defendant from $29.40 quarterly to $20.58 quarterly, amounting to $61.74, and avers that a note for the same was taken and accepted by the defendant company, through its general agent, O. K. Clardy, who paid the said sum in cash to the defendant and received in behalf of said Curtis the quarterly receipts therefor; that said note and all other sums to be paid up to January 15, 1900, were extended for payment to a period beyond the death of said Curtis, to wit, to the middle of February, 1900; that at the death of said Curtis the policy was in force; that a dividend from the profits of the company for 1899 should have been applied by the defendant company in reductions of the said three quarterly premiums, but the defendant failed to apply the same on the premiums; that no notice of the maturity of said premiums was given to Curtis, although it was the custom and method of said company to do so, with at least thirty days thereafter to pay the same; that no forfeiture of the policy was made or attempted by the defendant, but that long after the death of said Curtis, the defendant made claim that the policy was forfeited prior to the death of Curtis; that no

notice of such alleged forfeiture or attempt to forfeit was ever given Curtis or the plaintiff during the lifetime of Curtis; that by reason of the premises the defendant waived payment in cash of the said three quarter premiums from the plaintiff and accepted said payments from its general agent, Clardy, and gave full and complete receipts therefor to said Clardy for delivery to said Curtis, but Clardy withheld the same, claiming to hold the same as collateral security for said extension to February 14, 1900; that said receipts of right belong to the plaintiff; that in accordance with the insurance laws of Massachusetts the defendant, December 31, 1899, duly reported to the Insurance Commissioner of said state the said policy as in good standing, but thereafter, after the death of said Curtis, reported to said commissioner that the said policy was forfeited, which said forfeiture was not made during the lifetime of said Curtis.

To this declaration the defendant pleaded the general issue.

The case came on for trial before a jury December 12, 1905. After the evidence for the plaintiff had been heard a motion was made by the defendant for a peremptory instruction in its favor. This motion was allowed and such an instruction given, in accordance with which a verdict was returned finding the issues for the defendant.

The plaintiff moved in writing for a new trial, assigning twenty-five reasons therefor. The motion was denied and the judgment appealed from followed.

In this court the plaintiff has assigned thirty-six errors—in the said assignment repeating the reasons urged for a new trial with some additions.

The errors assigned amount in general to a challenge of the right of the court to take from the jury the question whether the policies sued on were in force at the time of Curtis's death; a complaint that certain

pieces of evidence offered were improperly excluded; and a contention that the defense made could not be sustained because not specially pleaded.

EDMUND H. SMALLEY and WILLIAM M. JOHNSON, for appellant.

EDWARD RYAN WOODLE and CODY & EATON, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

The evidence offered for the plaintiff in this case showed that in June, 1899, Mr. Curtis, who was then in the employ of the Maryland Casualty Company in Chicago, visited St. Louis on business, and called on a friend, a Mr. Clardy, with whom he had been intimately acquainted for some years. Clardy and Mr. Curtis three years before had both resided in St. Louis and been connected with the same Casualty Insurance Company in different capacities. In June, 1899, however, Mr. Clardy was the general agent for Eastern Missouri of the defendant, The State Mutual Life Assurance Company of Worcester, Massachusetts. Mr. Curtis said to Mr. Clardy that he was ready to make application for life insurance in that company. The matter of such an application had been under discussion between the two men for a year and a half. Clardy prepared Curtis's application for $7,000 of insurance. Curtis was medically examined and the company issued two policies of $3,500 each, dated June 30, 1899, and forwarded them to Clardy.

The parts of these policies (which were made payable to the plaintiff, the wife of Curtis at that time, on satisfactory proof of Curtis's death during the continuance of the policy) that are or are claimed to be material, so far as this case goes, are these on the face of the policies:

"This contract is made in consideration of the rep-

resentations and agreements made in the written and printed application of the insured, which is made a part of this contract, a full copy of which application, together with the medical examination, is hereunto annexed, and in further consideration of the sum of Twenty-nine and 40/100 dollars to be paid in advance and of the payment of the quarter annual premium of Twenty-nine and 40/100 dollars on the thirtieth days of June, September, December and March in every year during the continuance of this policy;'' and

"This policy shall be incontestable after two years from the date of its issue, provided the premiums shall be paid as agreed and the condition as to military and naval service is not violated."

And these annexed to the policy:

"This policy is issued subject to the provisions of the General Laws of Massachusetts applicable thereto, and is a contract made to be performed in accordance with the provisions of the law of the said Commonwealth."

"No agent has authority to modify or change this contract in any way."

"Said contract if issued shall at all times and places be held and construed to have been made at Worcester, Massachusetts."

"Premiums are due and payable at the office of the Company in Worcester, Mass., but for convenience the Company may appoint agents in various localities to receive the same."

"Notifications of premiums becoming due are regularly sent to the insured, but without any agreement on the part of the Company to do so, and without any responsibility for their omission or miscarriage."

Clardy had agreed with Curtis to divide with him the agent's commission of sixty per cent. of the first year's premiums to which he, Clardy, was entitled by virtue of his arrangement with the company, and therefore the amount which Curtis was to pay to Clardy

for the first quarter's premiums was seventy per cent. of the quarterly premiums stipulated in the two policies. This amounted to $41.16. The sum which Clardy would then be obliged under his arrangement to remit the company out of this amount was $23.52.

July 5, 1899, Clardy in St. Louis wrote Curtis in Chicago, enclosing the two policies, saying, "Take the policies and keep them in force and watch them grow in value and send me your check for $41.16, which will be the amount you will send me quarterly during the first year of the policy." Mr. Curtis did not, however, send the check asked for. In answer to a letter of Curtis to him of the date of July 25, 1899—which does not appear in the record—Clardy wrote on July 26th to Curtis telling him that he had advanced to the company the amount due it on the policies and could wait for Curtis's payments to him until the fifteenth of August, or if need be until August 23rd. There is some confusion in the testimony of Mr. Clardy, as it appears in the record as to when Clardy actually did send or account to the company for the $23.52 due it out of the first quarter's premiums. He testified that it was on August 25th, but as he immediately speaks of a letter of Curtis dated August 23rd as subsequent by some time to his remittance, and as he had then written twice to Mr. Curtis that he had already advanced the money, the statement may have been a slip of the tongue for July 25th, or have been misreported. At all events it is immaterial. August 16, 1899, Mr. Clardy had written to Mr Curtis again, reminding him that he, Clardy, had advanced the money for his policies to the company in a "former settlement," and asking for Curtis's check by the 24th, as it would then be needed for a settlement of "balance" he would owe the company on the 24th.

August 23rd Curtis replied to Clardy, expressing his embarrassment as being unable to meet his obligation to him, and enclosing his note to the order of

Clardy for $41.16, dated August 23, 1899, payable thirty days after date, additionally promising in the letter to meet it when due. As he did not do it however, Clardy wrote a reminder to him under date of October 3, 1899, and, as it would appear, others in October. At all events on October 25th he wrote a very urgent demand for the $41.16, which he said had been overdue more than a month. In reply Curtis wrote to Clardy the following letter:

"CHICAGO, Nov. 3, /99.

FRIEND CLARDY:—I have not forgotten you or my obligation. Have had no end of trouble and sickness. Have been away. Then sick, etc. Mother had a 2nd attack of paralysis. Expense large. Wife was sick. Following that my oldest boy now my 2nd boy and little Sarah. Salary was not increased as agreed. I am in close quarters all around and just at present I don't know which way to turn. Will be obliged to give up insurance for I cannot pay for same as I am now situated. When I applied all looked rosy. It is quite different now. What shall I do? Suggest something. What I owe you I will pay.

With great regards,
Yours truly,

*Confidential.*"                                    E. S. CURTIS."

In the meantime (about September 1st) the company had sent from the Home office to Mr. Clardy the "renewal receipts" on the Curtis policy for the quarterly premiums payable September 30, 1899. "Renewal receipts" are receipts sent by the company to a general agent to be delivered to the insured with the additional or counter signature of the agent when the premiums are paid.

In answer to Mr. Curtis's letter of November 3rd, Mr. Clardy made to Mr. Curtis a proposition in relation to these renewal receipts and the insurance under date of November 6, 1899. After expressing regret at Mr. Curtis' inability to pay him the overdue note, he says:

"Now as to the insurance, I am of course anxious to get my good money, and I would like to keep this amount I have written on you in force. If you can send me $25 in cash, and your note for $17 I will send you the receipts keeping this insurance in force until December 30th, and will wait a reasonable time for you to pay the notes. Now let me know what you can do. You should by no means let this chance go by to keep insured. Your family needs the protection."

These two letters—Curtis's of November 3d and Clardy's of November 6th—seem to us evidence that Curtis considered the insurance would necessarily lapse for non-payment of the second premium unless Clardy could make for him some arrangement and that Clardy indicated to him that it might be kept alive through the year by the payment of what in effect Clardy would have to remit to the company on account of the renewal receipts, if he did not return them. The note for the former indebtedness of $41.16 and the proposed new note for $17 representing Clardy's share of the premium of September 30, 1899, Clardy was willing to carry, so that his friend Curtis might have the insurance until the end of the year at least.

But Curtis apparently was unable to take advantage of the offer, for under date of December 1, 1899, after speaking of another matter of business between them, Clardy writes Curtis, "You never said what you would do with my last proposition regarding your own insurance. Can't you look up that letter and give me an answer? I think you ought to accept it if it is possible for you to do so."

No further letters relating to the payment of premiums appear in evidence, although evidence hereafter alluded to was offered to establish the contents of a subsequent letter and reply concerning them passing between Clardy and Curtis.

In January, 1900,—Mr. Clardy testifies it was on January 10th, and Mr. Sartelle, the actuary for the de-

fendant company, that it was on January 16th—Mr. Clardy, returned to the company the renewal receipts for the September 30th premiums. On January 13, 1900, the account of Clardy was entered in the company's books at the head office, showing the policies as lapsed.

On January 11, 1900, Clardy again dunned Curtis for the outstanding note of $41.16, and Curtis, writing from Iowa under date of January 13th, said he would be at home on the 23d and hoped to have some money so that he could pay in whole or in part. Walter Johnson, a brother of the plaintiff, testified that shortly after Mr. Curtis's death, which occurred suddenly on January 31, 1900, he called on Mr. Clardy at his office in St. Louis, and asked about the policies in question; that Mr. Clardy stated that Curtis carried a policy of $7,000; that he, Clardy, had written to Curtis shortly before his death and Curtis had replied at the bottom of the letter; that Clardy thereupon took from his desk a letter and showed it to Johnson; that it was, to the best of Johnson's recollection, dated January 23, 1900, and its substance was a request for the payment of a certain note and an inquiry as to what Curtis was going to do about keeping the policy in force and the payment of premiums then due and to become due, and that on the bottom of the letter Curtis had replied that he intended to pay the note and the premiums that were due. Although Mr. Clardy testified that he had no recollection of any letter of his to Curtis of such a date concerning the insurance, and thought that any letter of January 23d must have referred solely to the note which he held unpaid, yet in view of the fact that the cause was taken from the jury by a peremptory instruction, we must assume that such a letter as Johnson testified to existed.

We do not think, however, that it alters the status of the case. If at that time the policies were in force, they continued to be so on January 31st; but if, on the other hand, they had been lapsed, it is plain that a

mere inquiry by the agent, and the statement of an intention by the assured indefinite in character and not eventuating in any act whatever of company, agent or assured, could not revive them. Such expressed intention could only be construed as the expression of a purpose to apply for such a renewal in the future. Nor could the statement of the agent, to Johnson, at this time, that Curtis "carried a policy of $7,000" have any effect of an admission binding the company.

A contention is vigorously made that the return of the insurance company to the Insurance Commissioner of Massachusetts (filed with him February 2, 1900) of the policies in force December 31, 1899, was an admission and proof that the policies in question had not lapsed. With the explanation in the testimony concerning that report, its purpose and object, we do not think it furnished any evidence of the facts which changed the effect of the contract of insurance, or which can be appealed to, to overcome whatever was the effect of the transactions and communications between Curtis, Clardy and the company subsequent to the issue of that contract. The return to the insurance commissioner always comprised all policies on which renewal receipts sent out to agents had not been returned, and the exact status of which the home office was not prepared therefore to assert. It was for the purpose of measuring certain obligations imposed by the law of Massachusetts, and the company properly construed the law to extend the obligation to any case in which there was doubt. The fact that these two policies were included in the report seems to us, therefore, without material relevancy in this case.

Again, counsel for appellant has argued that because the president of the company in letters to him refused payment "on the ground that the contract of insurance was never consummated," the company could not afterwards "shift its ground of defense" and admit that the policies were in force from June 1, 1899, to September 30, 1899, but then lapsed for non-payment of

the second quarter's premium. This position cannot be maintained. Apart from the accuracy or applicability of the various authorities cited by plaintiff's counsel to this point, the statements of the president in the letters referred to were, as to the facts, absolutely correct, and his conclusion of law therefrom was immaterial. It was for the counsel for the company, not for the president, to formulate the legal defense which the facts presented.

It is urged also that because the defendant company did not specially plead a "forfeiture" to the contracts of insurance set forth in the declaration, the evidence of non-payment of premium was improper, and the defense could not be made. The "lapse" or "forfeiture," the appellant says, was, if it took place at all, the effect of a condition subsequent, which must be specially pleaded. Without attempting, in discussing this point, to distinguish between a "lapse" and a "forfeiture," or to decide whether the quarterly payment of premiums was a condition "precedent" or "subsequent," it is sufficient to say that where the declaration on an insurance policy states, as in this case it does, the facts concerning an alleged breach of conditions, and attempts to avoid its result, or to anticipate what would otherwise be the pleadings of defendant in relation thereto, the general issue will be sufficient to form the issues tendered by the declaration.

The question involved is somewhat discussed in Concordia Fire Insurance Co. v. Bowen, 121 Ill. App. 35, where it is pointed out that the necessity of specially pleading failure of performance of conditions in insurance policies may be and often has been obviated by the plaintiff's complaint in itself showing affirmatively the things relied on as a defense.

The decision of the case at bar, therefore, does not turn upon estoppels, admissions or pleadings, but on the question whether or not the policies had lapsed at

the time of the death of Curtis, January 31, 1900, or were then in force, for lack of some further affirmative action by the company to forfeit them and to bring the knowledge of the forfeiture home to Curtis.

We may properly ignore, we think, the calculations by which counsel endeavors so to "marshal and apply" the payment which he assumes Curtis made by his note of $41.10 sent to Clardy on August 23, 1899, as to pay the company until the day following the death of Curtis. This is a fantastic rather than a serious claim. The note was sent to Clardy by Curtis because the amount of it was the amount due *him*, Clardy, from Curtis at that time—not as a payment to the company of any amount or for any period whatever.

This indebtedness had accrued from Curtis to Clardy because the latter had paid to the company Curtis's first quarter's premiums, and the real question is, what was the effect on the policies of the failure of Curtis, or of anybody for him, to pay any further premiums, coupled with his letter of November 3d to the general agent, Clardy.

It is claimed by appellant that communications between Clardy and Curtis subsequent to the letter of November 3, 1899, had the effect of waiving the "lapse," or, as she prefers to call it, "forfeiture," if such lapse or forfeiture had occurred; but as we have already indicated in relation to the alleged letter and answer of January 23, 1900, we do not think that the further inquiries and suggestions of Clardy, unacted on by Curtis, changed the situation.

But apart from these communications, the appellant claims that to render these policies invalid or unenforceable after Curtis's death, there must have been in his lifetime an affirmative act of forfeiture or disavowal on the part of the company, followed by notice to the assured. To support this view her counsel cites such cases as Thompson v. Knickerbocker Life Insurance Co., 104 U. S. 252; Hartford Life Insurance

Co. v. Unsell, 144 U. S. 439; Chicago Life Insurance
Co. v. Warner, 80 Ill. 410; Bennett v. Union Central
Life Ins. Co., 203 Ill. 439; Bankers Life Ins. Co. v.
Wells, 200 Ill. 445; U. S. Life Insurance Co. v. Ross,
159 Ill. 476; Mutual Life Ins. Co. v. Allen, 212 Ill. 144;
and Ferguson v. Union Mutual Life Ins. Co., 187 Mass.
14.

Appellant claims that no action was here taken and
no such notice given as would effect the cancelation.

Appellee, on the other hand, contends that because
the premium was not paid for the second quarter of
the year, the insurance did not come into existence for
that quarter, and cites to sustain its contention such
cases as Roberts v. Aetna Life Ins. Co., 101 Ill. App.
315—212 Ill. 382; Kearney v. Aetna Life Ins. Co.,
109 Ill. App. 609; Parker v. Bankers' Life Associa-
tion, 86 Ill. App. 322; N. Y. Life Ins. Co. v. Slatham,
93 U. S. 24; Robert v. New England Life Ins. Co., 1
Disney 355.

The question is not without difficulty, for the cases
cited by appellant differ materially from the one under
investigation here. They are mostly cases in which the
well known rule is invoked that a forfeiture will not
be favored and that its waiver may be inferred from
various circumstances, some of them apparently slight,
in the relations of the assured to the company or its
agent. Certainly none of them are exactly applicable
to the situation at bar.

On the other hand the cases cited by appellee are
those of insurance policies which contained an express
self-executing clause providing for their lapse on the
non-payment of a premium when it became due. Such
a provision in the present policies, if found, must be
implied. It is not there in express terms.

We have considered this case carefully in the light
of these decisions and such others as we have found
for ourselves, bearing, as we think, on the main ques-
tion involved, and we have reached the conclusion that

the courts have never gone so far as to hold policies like these, under circumstances like these, in force at the death of the assured.

Certain salient features of the situation cannot be wholly ignored in our consideration of the case. It is not such a forfeiture after many premiums paid as "the law abhors" which is here claimed. The assured paid nothing, and but one quarter's premium was ever paid for him. It is not a case where an extension of time was definitely given in which to pay the overdue premiums, nor a case where, as in Bennett v. Ins. Co., 104 Ill. App. 402, and 203 Ill. 407 (again decided in this court on October 3, 1907, under the name of Ins. Co. v. Burnett, No. 13,291, 136 Ill. App. 187), the company had taken security for the premium. The defendant is a mutual company; the rights of every member who has contributed and paid for the protection it affords are directly affected injuriously if any loss is paid for which the company is not strictly liable.

Nor is there in this case any element of a false feeling of security induced in the deceased by any act of the company or its agent. On the contrary, Mr. Curtis plainly declared his inability to take advantage of the opportunity, which his friend by his former payment had placed in his way, of continuing the insurance, and showed that inability by neglecting a favorable offer made for a further adjustment. We think he abandoned the insurance, although entertaining possibly a hope, which is immaterial in this controversy, that he might be enabled to take it up again or reinstate it if affairs took a more prosperous turn for him.

But such a turn did not come, and the policies in the hands of the deceased at his death were abandoned and lapsed. They had indeed at that time been so marked upon the company's books by its affirmative act. Notice to Curtis of that action was not necessary under the circumstances and in the situation shown by this record. Denver Life. Ins. Co. v. Crane, 19 Colo. App.

191 (73 Pac. Rep. 875); Manhattan Life Ins. Co. v. Myers, 109 Ky. 372; Leonhard v. Provident Sav. L. Assoc., 130 Fed. Rep. 287.

We think it was clearly proved "that the condition was clearly and definitely understood by the insured." United States Life Ins. Co. v. Ross, 159 Ill. 479, page 486.

The judgment of the Superior Court is therefore affirmed.

*Affirmed.*