CHEROKEE CONSTRUCTION COMPANY *v.* BISHOP.

Opinion delivered May 25, 1908.

1. FORFEITURE—ENFORCEMENT IN EQUITY.—Though as a rule equity will not enforce a forfeiture, yet where the forfeiture works equity and protects the rights of parties, equity will enforce it. (Page 498.)

2. SAME—LEASE OF MINE.—Where a lease of land stipulates that the lessee shall operate the mine opened upon the land with due dili-

gence, and that at no time during the term of the lease shall such mine remain idle for more than thirty consecutive days, unless caused by strikes, floods, etc., failure to work the mine for more than thirty consecutive days, except for one of the causes mentioned, will be a ground of forfeiture in equity. (Page 502.)

3. FIXTURES—LEASE.—Where a lease of a mine stipulated that the lessee might at any time move any machinery from the premises, provided the royalty due the lessor has been paid, such machinery did not constitute a fixture, and was removable upon payment of such royalty. (Page 503.)

Appeal from Sebastian Chancery Court; *J. Virgil Bourland,* Chancellor; reversed in part.

*Ira D. Oglesby,* for appellant; *Geo. W. Dodd* and *J. M. Spradling,* of counsel.

1. The decree can only be sustained upon the theory that the mere removal of the large machinery from No. 2 slope authorized cancellation of the lease. This cannot be sustained. When the coal reached this slope and from a practical miner's standpoint became unworkable, then appellant had the right to sink an opening at such place as its judgment dictated for the purpose of removing the remaining coal, in the meantime paying minimum royalty.

2. The court erred in awarding judgment for the value of the machinery removed. For rules to determine whether the article is chattel or fixture, see 56 Ark. 55; 75 Ark. 232. By the terms and provisions of the lease itself the machinery is conclusively shown to be chattel property and not a fixture. 72 Ark. 500; 1 Tiffany, Real Prop. 544; 19 Cyc. 1048, 1049; 16 Ark. 511; 19 Cyc. 1048, note 76; 19 Cyc. 1056 and 1071, note 92; 84 Am. St. Rep. 881 and notes; 42 Miss. 732; 38 Me. 569; 27 Ark. 648. A controlling distinction between removable and irremovable fixtures is the character of the use of the fixture. If a fixture is placed on land for use that does not enhance the value of the realty, this is evidence that it is personal property. 42 Kan. 23; 16 Am. St. Rep. 471; 45 *Id.* 285; 54 Kan. 300; 13 Am. & Eng. Enc. of L. (2 Ed.), 612 and notes; 148 Ill. 163; 39 Am. St. Rep. 166 and notes; 62 Pa. St. 372; 11 Ala. L. J. 151; 24. Am. Rep. 719; 29 Wis. 655; 30 Md. 347; 22 Ohio St. 563; 10 Am. Rep.770. "As between landlord and tenant, the rule is

well settled that trade fixtures, although securely fastened to the freehold, are the personal property of the tenant, and may be removed by him, if the removal can be effected without injury to the freehold." 4 Lea, 329; 4 Watts, 330; 7 Atl. 154; 43 Miss. 349; 2 Dev. 276; 7 Cow. 319; 23 Ind. 562; 25 Kan. 322; 30 N. E. 831; 48 Miss. 1; 80 N. W. 543.

*Miles & Miles, Rob't A. Rowe, T. B. Pryor* and *J. N. Rachels,* for appellees.

1. The lease was properly cancelled. In construing it, the whole instrument must be considered. 18 Am. & Eng. Enc. of L. 617, § 7; 17 *Id.* 4; 20 *Id.* 778, note 5; White on Mines & Mining Remedies, 337, § 253. It is no defense that the mine could not be profitably worked. White on Mines & Mining Remedies, § 263, note 4; 5 Moak, Eng. R. 114; Law Rep. 2 Scotch Ap. 273; B. & W. L. C. 430; 60 S. W. 304; 56 Mo. App. 221; 9 Sim. 519; 13 M. & W. 487; 81 Ala. 299; 36 Ohio St. 174.

2. All the machinery, tipple and all other appliances placed upon the premises were fixtures for the term of the lease, unless all coal was sooner worked out. Appellant had no right to remove the machinery and appliances, even after the term or the working out of all the coal, unless all royalties were fully paid. 56 Ark. 55; 73 Ark. 227; 10 Bosw. 537; 47 Cal. 56. As to intention: 56 Ark. 61; 63 Ark. 628; 65 Ark. 26; 13 Am. & Eng. Enc. of L. 602; 41 Barb. 234.

BATTLE, J. On the 26th day of February, 1901, Araminta D. Bishop and others leased certain lands to Jerry M. Cravens for a period of thirty years. The lease is as follows:

"This contract and agreement, made and entered into this 26th day of February, A. D., 1901, by and between Araminta D. Bishop, widow of R. A. Bishop, deceased, Titula W. Hocott and Thomas Hocott, her husband, Lee S. Bishop and wife, Hay Bishop, Almira T. Shelton and her husband, John H. Shelton, Ben Bishop and wife, Minnie Bishop, of Sebastian County, Arkansas, parties of the first part, and Jerry M. Cravens of Sebastian County, Arkansas, party of the second part.

"WITNESSETH: That the parties of the first part, for themselves, their heirs, executors, administrators and assigns, in con-

sideration of the sum of one dollar to them in hand paid by the party of the second part, the receipt whereof is hereby acknowledged, and for the further consideration and covenants hereinafter mentioned, have leased and do hereby lease and let to the party of the second part, his heirs, executors and assigns, the following described lands for the purpose. hereinafter named situated in the Greenwood District of Sebastian County, State of Arkansas, towit: the northeast quarter section thirteen and north half of northwest quarter and north half of the southeast quarter of northwest quarter, section thirteen, township five, range thirty-two, northeast quarter section thirteen and north half of northwest quarter and north half of southeast quarter of northwest quarter of section thirteen, township five, north, range thirty-two west, except one acre of said land in square form upon which the said parties of the first part's dwelling and adjoining buildings are now situated, which is strictly understood is reserved from the operation of this lease, and no coal is to be mined or taken therefrom.

"With the sole and exclusive privilege of mining for coal and operating coal mines thereon and taking and selling coal therefrom for the term and period of thirty years from this date, hereby giving to the party of the second part the exclusive right to mine coal on said premises and to remove and sell the same for the term aforesaid, hereby giving the party of the second part, for the consideration aforesaid, the privilege of taking sufficient coal out of said premises for stationary machinery necessary for conducting said mining operations free of charge, and said party of the second part shall have the right free of charge to take from the premises all such timber and stone as may be necessary to be used to conduct said mining business, that is to say, all of such material as may be necessary to be used in constructing and maintaining said mine or mines, but not to include such timber as is used in building houses, tipples, railroad bridges and railroad ties, and all timber so used for said purpose shall be paid for at the price of two dollars per thousand feet, standard measure.

"And the said party of the second part shall also, for the consideration aforesaid, have the right to erect on said premises all necessary buildings for the purpose of carrying on said coal

mining business, including dwellings for miners and other employees of said second party, and said party of the second part, his successors or assigns, shall have the right to build and maintain roads and railways to and from all shafts, slopes or strip pits now on said premises or that may hereafter be put thereon for the use of said mine or mines, and said party of the second part, his agents, successors or assigns, shall fence all the aforesaid railroad tracks and build and maintain suitable stock gaps thereon, and it is further understood and agreed that said party of the second part, or his legal representative, shall build and maintain gates on all dirt roads made by them as aforesaid when said roads enter upon any of the enclosure of said party of the first part.

"It is further agreed and understood that the party of the second part is to pay all taxes on improvements placed on said premises by the party of the second part, and the taxes on the realty are to be paid by the party of the first part.

"It is further understood and agreed that the party of the second part shall enter upon said land within ninety days from date hereof and begin sinking slope or shaft, and in event it is not commenced in the time specified then the party of the second part forfeits this lease and all privileges thereunder and all improvements made thereon to the parties of the first part.

"The party of the second part agrees and binds himself, his successors or assigns, that, should he elect to sink shaft or slope upon the line running east and west between the southeast quarter and the northeast quarter of said section thirteen, township five north, range thirty-two west, he will have, on or before the first day of July, 1902, in place upon said premises, for the operation of said slope or shaft, not less than two boilers of 60-horse power each and hoisting engine of not less than 100-horse power and all other necessary appliances for the successful operation of said mine or mines.

"It is further understood and agreed that said party of the second part, his successors or assigns, shall pay to the party of the first part the following royalty, to-wit: For mine run coal the sum of five cents per ton, 2,000 pounds to constitute a ton, (bulletin weights to govern settlement). The minimum royalty to be $500.00 per year during the period of this lease, or until

the coal shall be worked out, and, should all of the said coal be mined from said land before the expiration of the lease, then said minimum royalty shall cease, and, in case the royalty on coal mined shall exceed in any one year the said sum of $500.00, then the excess of royalty of previous years shall be applied to the deficiency. The royalty as aforesaid to be paid on the 20th day of each month for the coal mined the previous month, *i. e.*, coal mined in March, 1901, the royalty on same would be due and payable April 20 of same year, and, in the event that said royalty is not paid as aforesaid within ninety days from the date it becomes due, then said party of the second part, his successors or assigns, shall forfeit this lease and all privileges thereunder, and in no case shall any machinery or other improvements be removed from the premises or disposed of by the party of the second part, his successors or assigns, until said royalty is fully paid. And it is expressly understood and agreed that said parties of the first part, or their legal representatives, shall have a first lien upon all of said improvements and machinery that are now upon said leased premises or may hereafter be put thereon by the party of the second part, his successors or assigns, until royalties herein provided for are fully paid.

"Said party of the second part, his successors or assigns, shall furnish the parties of the first part, or their legal representatives, a statement on the 15th day of each month for all coal mined the previous month, said statement to be made from bulletin weights, and the parties of the first part or their legal representatives shall at all reasonable hours have access to the weigh books, bulletin sheets and other records of the coal mined and kept in his office.

"It is further understood and agreed by the parties hereto that said mines or mine shall be operated by the party of the second part, his successors or assigns, with due diligence, and at no time during the period of this lease shall said mine or mines be idle for more than thirty consecutive days in any one year, unless same is caused by strikes, labor troubles, shortage in cars, floods, explosions, fires, shortage in orders, or other unavoidable circumstances not within the power of the party of the second part to prevent.

"It is further understood and agreed by the parties hereto

that the party of the second part, his successors or assigns, may, at such times as he or they may deem best, move or cause to be moved any buildings, machinery, railroad tracks or materials which he or they have put upon said premises without force or process of law; provided, however, that the royalty has been paid as aforesaid and work commenced within ninety days as aforesaid.

"It is understood and agreed by the parties hereto that the party of the second part, his successors or assigns, shall have the right to sublet said premises for the purposes of mining coal as aforesaid, subject to all the conditions of this lease.

"It is hereby agreed by the parties of the first part, or their legal representatives, that said party of the second part, his successors or assigns, shall have the sole and exclusive right to locate, own or conduct a mercantile business on said premises for the period of this lease.

"It is further understood and agreed that said parties of the first part, or their legal representatives, shall at all times during reasonable hours have the right to enter said mine or mines for the purpose of investigation.

"In witness whereof, we have hereunto set our hands and seals, in duplicate, on this the day and date first above written.

> "Araminta D. Bishop (Seal),
> "Tahilah W. Hocott (Seal),
> "May Bishop (Seal),
> "John H. Shelton (Seal),
> "Minnie Bishop (Seal),
> "Thomas Hocott (Seal),
> "Lee S. Bishop (Seal),
> ."Almira Shelton (Seal),
> "Ben B. Bishop (Seal),
> "Jerry M. Cravens (Seal)."

Cravens assigned the lease to the Montreal Coal Company, and it assigned the same to the Cherokee Construction Company. A mine was opened on the leased land, and machinery of the description stated in the lease was placed therein for the purpose of operating it. On the third day of July, 1905, the lessors brought a suit in the Sebastian Chancery Court, for the Greenwood District, in Sebastian County, against Cravens and

Cherokee Construction Company to cancel the lease and for other relief. After setting out the terms of the lease, the plaintiffs alleged in their complaint as follows: "That the lessees have failed and refused to pay to the lessors the minimum royalty provided by the terms of the lease for a period of time much longer than provided in the lease contract, and plaintiffs further charge that the lessees have moved away from the premises the machinery placed thereon for the purpose of mining coal, and have thus destroyed security out of which the lessors had the right, according to the terms of the lease, to secure the payment of the minimum royalty aforesaid. The plaintiffs further charge that the defendants have failed to furnish to the lessors on the 15th day of each month a statement of all the coal mined during the previous month according to the terms of the contract. The plaintiffs further charge that the lessees have violated their contract in that they have failed to operate the mine with due diligence, and have permitted the same to stand idle for more than thirty consecutive days in one year. Plaintiffs further charge that all the acts, conducts, failures and forfeitures hereinbefore complained of have destroyed the rights of the lessees with respect to the contract and to remain in possession of the premises. And plaintiffs, further complaining of the defendant, the Cherokee Construction Company, allege that they have been, by the wrongful acts and conduct of the defendant, its agents and employees, in violation of the terms and conditions of the lease, damaged in the sum of $15,000, as follows:

"For destroying and cutting timber upon the leased premises in the sum of $1,500, for removing tipple, machinery and all other equipment for the operation of the mine, and for pulling the pillars and destroying the underground work of the mine, in the sum of $13,500."

And asked as follows: "Wherefore, the premises considered, these plaintiffs pray that the lease herein set out shall be by the court cancelled; that the defendants and their agents or assigns shall be forever enjoined from setting up any claims to said premises or from going upon the same for the purpose of mining coal or for other purposes, and shall be perpetually enjoined from setting up any claim or right of title to said premises under the aforesaid lease, and that they have judgment

against the Cherokee Construction Company for damages as aforesaid in the sum of $25,000 and for all other and further relief to which in equity and good conscience they are entitled."

And the defendants, admitting the execution of the lease and the terms thereof so far as stated in the complaint, answered as follows:

"Defendants deny that the lessees have failed to pay lessors the minimum royalties provided by said lease contract for a period of time much longer than provided in said lease; and they also deny that the lessees have moved away from said premises the machinery placed thereon for the purpose of mining coal and have thus destroyed security out of which the lessor had a right, according to the terms of said lease, to secure payment of said royalties.

"Defendants also deny that they have failed to furnish the lessors a statement of all coal mined during the previous month, on the 15th day of each month, according to the terms of said lease contract, and also deny that the lessees have violated their contract by failing to operate said mine with due diligence, and that they have permitted the same to stand idle for more than thirty days of any one year, when within their power to prevent; and further deny that, by reason of anything alleged in the complaint, defendants have in any manner forfeited or destroyed their rights under said lease, or their right to remain in possession of said premises and further operate said mine.

"Further answering, defendants say that at expense of large sums of money, to-wit, $50,000, said lessees have opened up a coal mine upon the premises described in the complaint, and have developed said mine and operated the same with due diligence down to this day, and have not allowed same to remain idle for more than thirty consecutive days in one year, except when such idleness was enforced by labor troubles, shortage in cars, floods, shortage in orders, and other circumstances unavoidable and not within the power of defendants to prevent, and that most of the time during which said mine has remained idle, has been caused by shortage of orders, shortage in cars, and shortage in orders for coal produced from said mine, more especially the latter cause."

And denied the other allegations of the complaint so far as stated in this opinion.

The machinery in the mine was moved out by the Cherokee Construction Company on the second day of February, 1904. After its removal the pillars of the mine were pulled down, and the mine was virtually abandoned. All this was caused by the discovery of a fault of the depth of eighteen · feet and four inches, which made the operation of the mine impracticable. It (mine) was idle fom January 16, 1904, until October of the same year, and was idle three or four months before the bringing of this suit. There was no evidence that any effort was made to open a mine on other parts of the land.

The court cancelled the lease, and rendered judgment against the Cherokee Construction Company for $3,167, for the value of the machinery; and it appealed.

As a rule, equity will not enforce a forfeiture. · But there are exceptions to this rule. In cases where the forfeiture works equity and protects the rights of parties, equity will in effect enforce it. Courts of equity will not reject it when it becomes a means of enforcing equitable rights.

Pomeroy's Equity Jurisprudence says: "It is well settled that where the agreement secured is simply one for the payment of money, a forfeiture either of land, chattels, securitites, or money, incurred by its non-performance, will be set aside on behalf of the defaulting party, or relieved against in any other manner made necessary by the circumstances of the case, on payment of the debt, interest, and costs, if any have accrued, unless by his inequitable conduct he has debarred himself from the remedial right, or unless the remedy is prohibited, under the special circumstances of the case, by some other controlling doctrine of equity. Where the stipulation, however, is intended to secure the performance or non-performance of some act *in pais,* it is impossible to lay down any such general rule with which all the classes of decisions shall harmonize. It is certain that if the act is of such a nature that its value cannot be pecuniarily measured, if the compensation for a default cannot be ascertained and fixed with reasonable precision, relief against the forfeiture incurred by its non-performance will not, under ordinary circumstances, be given. The affirmative of this propo-

sition cannot be stated as a rule with the same generality. It has, indeed, been said that equity would relieve against forfeitures in all cases where compensation can be made; but this is clearly incorrect. It is well settled that a court of equity will not, under ordinary circumstances, set aside forfeitures incurred on the breach of many covenants contained in leases, or of stipulations in other agreements, although the compensation for the resulting injury could be ascertained without difficulty." 1 Pomeroy's Equity Jurisprudence (3 Ed.), § 450.

Again he says: "It is a well settled and familiar doctrine that a court of equity will not interfere on behalf of the party entitled thereto, and enforce a forefeiture, but will leave him to his legal remedies, if any, even though the case might be one in which no equitable relief would be given to the defaulting party against the forfeiture. The few *apparent exceptions* to this doctrine are not real exceptions, since they all depend upon other rules and principles. The reasons of the doctrine are to be found in the universal principle that a court of equity refuses to aid any party who, by the remedy which he seeks to obtain against his adversary, is not himself doing equity, or who does not come before the court 'with clean hands'—the same principle upon which the court acts when it refuses to specifically enforce a contract which is unequal, unjust, or has any inequitable features and incidents." (*Ib.* § § 459, 460 and notes). From this we (this court) understand the author to mean that a court of equity will enforce a forfeiture where its enforcement involves equitable rights and principles, and in that case it would not be the enforcement of the forfeiture as such but of the equitable rights and principles.

The law of insurance affords examples of the necessity of forfeitures, the enforcement of which would be consonant with equity. In *New York Life Insurance Company v. Statham,* 93 U. S. 24, Mr. Justice Bradley, delivering the opinion of the court, said: "Promptness of payment is essential in the business of life insurance. * * * Delinquency cannot be tolerated nor redeemed, except at the option of the company. * * * Time is material and of the essence of the contract. Nonpayment at the day involves absolute forfeiture, if such be the terms of the contract. * * * Courts cannot, with safety,

vary the stipulation of the parties by introducing equities for the relief of the insured against their own negligence."

In *Klein* v. *Insurance Co.,* 104 U. S. 88, it was said: "If the assured can neglect payment at maturity, and yet suffer no loss or forfeiture, premiums will not be punctually paid. The companies must have some efficient means of enforcing punctuality. Hence their contracts usually provide for the forfeiture of the policy upon default of prompt payment of the premiums. If they are not allowed to enforce this forfeiture, they are deprived of the means which they have reserved by their contract of compelling the parties insured to meet their engagements. The provision, therefore, for the release of the company from liability on the failure of the insured to pay the premiums when due is of the very essence and substance of the contract of life insurance. To hold the company to its promise to pay the insurance, notwithstanding the default of the assured in making punctual payment of the premiums, is to destroy the very substance of the contract."

*Brown* v. *Vandergrift,* 80 Pa. St. 142, is a case wherein equity enforced a forfeiture based upon the same reason and principle as the forfeiture of a policy of insurance. The syllabus in that case is as follows:

"I.   Brady leased to Lambing a lot of land, to have the sole right to bore for oil, etc., for twenty years, Lambing to commence operations in sixty days *and continue with due diligence; if he should cease operations twenty days at any one time, Brady might resume possession.* There were other covenants in the lease, and it was then stipulated that a failure of Lambing to comply with any one of the conditions should work a forfeiture, and Brady might enter and dispose of the premises as if the lease had not been made. It was further agreed that, if Lambing did not commence operations at the time specified, he should pay Brady $30 per month until he should commence. *Held,* that the covenant of forfeiture was modified, not abrogated, by the clause for payment of rent.

"2.   Lambing did not commence operations; he paid four months' rent; he omitted payment for eleven months and then tendered the amount for that time. *Held,* that the lessor might refuse the tender and insist on the forfeiture.

"3.  In such case time is of the essence of the contract, and equity follows the law, and will enforce the covenant of forfeiture as essential to do justice.

"4.  Equity abhors a forfeiture when it works a loss that is contrary to equity, not when it works equity and protects the lessor against the laches of the lessee."

Chief Justice Agnew, speaking for the court, said: "The discovery of petroleum led to new forms of leasing land. Its fugitive and wandering existence within the limits of a particular tract was uncertain, and assumed certainty only by actual development founded upon experiment. The surface required was often small compared with the results, when attended with success, while these results led to great speculations by means of leases covering the lands of a neighborhood like a flight of locusts. Hence it was found necessary to guard the rights of the landowner, as well as public interest, by numerous covenants, some of the most stringent kind, to prevent their lands from being burdened by unexecuted and profitless leases, incompatible with the right of alienation and the use of the land. * * * Hence covenants became necessary to regulate the boring of wells, their number and time of succession, the period of commencement and of completion, and many other matters requiring special regulation. Prominent among these was the clause of forfeiture to compel performance and put an end to the lease in case of injurious delay or a want of success. These leases were not valuable, except by means of development, unlike the ordinary terms for the cultivation of the soil, or for the removal of fixed minerals. A forfeiture for non-development or delay therefore cut off no valuable rights of property while it was essential for the protection of private and public interest in relation to the use and alienation of property. * * * That time may be made of the essence of the contract by the express agreement of the parties has been so often decided that no citation of authority is necessary. In a case like this equity follows the law, and will enforce the covenant of forfeiture, as essential to do justice. It is true as a general statement that equity abhors a forfeiture, but this is when it works a loss that is contrary to equity; not when it works equity and protects the landowner against the indifference and laches of the lessee

and prevents a great mischief, as in the case of such leases."

It is said that it is common for leases of land for the purpose of sinking wells for oil to contain covenants for diligent operation and for forfeiture in case of suspension, and such forfeitures are sometimes enforced in equity because the oil is a fluid likely to flow a considerable distance through the crevices and loose sand where it is found, and, if not removed, may be wholly lost to the owner of the land by reason of wells on land adjoining, and because its enforcement is essential to the protection of the rights of the owner, and because the lease yields nothing when idle, and is an incumbrance on the lands of the owner, tying his hands against selling or leasing to others. *Munroe* v. *Armstrong,* 96 Pa. St. 307.

In *Harper* v. *Tidholm,* 155 Ill. 370, Tidholm entered into a written contract with Harper, by which he bound himself, in consideration of a certain sum paid as earnest to bind the contract and of a certain other sum to be paid as purchase money, to convey certain lands to Harper when the stipulated price was paid; and provided that, if Harper failed to pay the purchase money at the time and in the manner specified in the contract, the money paid as earnest should, at the option of the vendor, be forfeited as liquidated damages, and the contract should be null and void. The contract was recorded. The purchase money not being paid at maturity upon demand, the vendor, upon tender of a deed for the land to the purchaser and his refusal to pay, declared the contract void and the earnest forfeited, and filed his bill in equity to cancel and remove the agreement and record as a cloud upon his title. The court, finding that the contract was null and void, and, being recorded, was a cloud upon the title of the vendor, decreed that it be cancelled and removed, and that the earnest be forfeited.

In this case it was stipulated in the lease that the lessee, his successors and assigns, shall operate the mine or mines opened upon the land with due diligence, and that, at no time during the term of the lease, shall it or they remain idle for more than thirty consecutive days in any one year, unless the same was caused by strikes, etc. The only mine upon the land remained idle about ten consecutive months in the year 1904, and three or four months in 1905. The lease thereby became

forfeitable at the option of the lessors (Barringer & Adams on the Laws of Mines and Mining, page 148; 20 Am. & Eng. Enc. of Law (2 Ed.), pages 778-780, paragraph 7 b, and cases cited) ; and they have so elected; and the enforcement of the forfeiture thereby created is necessary to protect them against unnecessary and injurious delays, and to protect them against an unprofitable lease being perpetuated by laches and kept hanging over their property like clouds upon titles, and to relieve their land of a burden.

"The findings of the court in favor of the plaintiffs for the value of the machinery is based on the theory that it was a fixture, became and was a part of the realty, and, defendant having removed the same, plaintiff could recover its value." This is error. Whether it was a fixture is determined by the intention of the parties expressed in clear and unambiguous language. *Choate* v. *Kimball,* 56 Ark. 55; *Ozark* v. *Adams,* 73 Ark. 227.

The lease clearly shows that the machinery was to remain the property of the lessees. After stipulating that the lessees should have the right to make certain improvements, it then provides:

"It is further agreed and understood that the party of the second part is to pay all taxes on improvements placed on the said premises by said party of the second part, and the taxes on the realty are to be paid by the party of the first part."

After stipulating that royalty shall be paid, and that the lease shall be forfeited if it is not paid in ninety days after it is due, it then provides:

"And in no case shall any machinery or other improvement be removed from the premises or disposed of by the party of the second part, his successors or assigns, until said royalty is fully paid. And it is expressly understood and agreed that said parties of the first part, or their legal representatives, shall have a first lien upon all of said improvements and machinery that are now upon said leased premises or may hereafter be put thereon by the party of the second part, his successors or assigns, until royalties herein provided for are fully paid.

And then this stipulation follows:

"It is further understood and agreed that the party of the second part, his successors or assigns, may at such times as he

or they may deem best move or cause to be moved any buildings, machinery, railroad tracks or materials which he or they have put upon said premises without force or process of law, provided, however, that the royalty has been paid as aforesaid and work commenced within ninety days as aforesaid. It is understood and agreed by the parties hereto that the party of the second part, his successors or assigns, shall have the right to sublet said premises for the purpose of mining coal as aforesaid, subject to all the conditions of the lease."

The only interest the lessors was to have in the machinery was a lien for unpaid royalty.

The decree as to the cancellation of the lease is affirmed; and the judgment for $3167 is reversed.