## NEW YORK LIFE INSURANCE COMPANY *v.* STATHAM ET AL.

### SAME *v.* SEYMS.

## MANHATTAN LIFE INSURANCE COMPANY *v.* BUCK, EXECUTOR.

1. A policy of life assurance which stipulates for the payment of an annual premium by the assured, with a condition to be void on non-payment, is not an insurance from year to year, like a common fire policy; but the premiums constitute an annuity, the whole of which is the consideration for the entire assurance for life; and the condition is a condition subsequent, making, by its non-performance, the policy void.

2. The time of payment in such a policy is material, and of the essence of the contract; and a failure to pay involves an absolute forfeiture, which cannot be relieved against in equity.

3. If a failure to pay the annual premium be caused by the intervention of war between the territories in which the insurance company and the assured respectively reside, which makes it unlawful for them to hold intercourse, the policy is nevertheless forfeited if the company insist on the condition; but in such case the assured is entitled to the equitable value of the policy arising from the premiums actually paid.

4. This equitable value is the difference between the cost of a new policy and the present value of the premiums yet to be paid on the forfeited policy when the forfeiture occurred, and may be recovered in an action at law or a suit in equity.

5. The doctrine of revival of contracts, suspended during the war, is based on considerations of equity and justice, and cannot be invoked to revive a contract which it would be unjust or inequitable to revive, — as where time is of the essence of the contract, or the parties cannot be made equal.

6. The average rate of mortality is the fundamental basis of life assurance, and as this is subverted by giving to the assured the option to revive their policies or not after they have been suspended by a war (since none but the sick and dying would apply), it would be unjust to compel a revival against the company.

THE first of these cases is here on appeal from, and the second and third on writs of error to, the Circuit Court of the United States for the Southern District of Mississippi.

The first case is a bill in equity, filed to recover the amount of a policy of life assurance, granted by the defendant (now appellant) in 1851, on the life of Dr. A. D. Statham, of Mississippi, from the proceeds of certain funds belonging to the defendant attached in the hands of its agent at Jackson, in that State. It appears from the statements of the bill that the annual premiums accruing on the policy were all regularly paid, until the breaking out of the late civil war, but that, in consequence of that event, the premium due on the 8th of December, 1861, was not paid; the parties assured being residents of Mississippi, and the defendant a corporation of New York. Dr. Statham died in July, 1862.

The second case is an action at law against the same defendant to recover the amount of a policy issued in 1859 on the life of Henry S. Seyms, the husband of the plaintiff. In this case, also, the premiums had been paid until the breaking out of the war, when, by reason thereof, they ceased to be paid, the plaintiff and her husband being residents of Mississippi. He died in May, 1862.

The third case is a similar action against the Manhattan Life Insurance Company of New York, to recover the amount of a policy issued by it in 1858, on the life of C. L. Buck, of Vicksburg, Miss.; the circumstances being substantially the same as in the other cases.

Each policy is in the usual form of such an instrument, declaring that the company, in consideration of a certain specified sum to it in hand paid by the assured, and of an annual premium of the same amount to be paid on the same day and month in every year during the continuance of the policy, did assure the life of the party named, in a specified amount, for the term of his natural life. Each contained various conditions, upon the breach of which it was to be null and void; and amongst others the following: " That in case the said [assured] shall not pay the said premium on or before the several days hereinbefore mentioned for the pay-

ment thereof, then and in every such case the said company shall not be liable to the payment of the sum insured, or in any part thereof, and this policy shall cease and determine." The Manhattan policy contained the additional provision, that, in every case where the policy should cease or become null and void, all previous payments made thereon should be forfeited to the company.

The non-payment of the premiums in arrear was set up in bar of the actions; and the plaintiffs' respectively relied on the existence of the war as an excuse, offering to deduct the premiums in arrear from the amounts of the policies.

The decree and judgments below were against the defendants.

*Mr. Matt. H. Carpenter* and *Mr. James A. Garfield* for the appellant in the first case, and for the plaintiff in error in the second. The third case was submitted by *Mr. Alfred Pitman* for the plaintiff in error.*

The rights involved depend upon the contract. The court will not interpolate new conditions, but hold the parties to their agreement. *Dermott* v. *Jones*, 2 Wall. 1; *Jeffreys* v. *Life Ins. Co.*, 22 id. 47. It consists of two parts, and is divisible. The payment of the first premium accomplished two things: *First*, it effected an insurance upon the life of the applicant for one year, which is, so far as he is concerned, an executed contract. Should he die within that specific period, the company absolutely covenants to pay the amount of the policy. *Second*, it purchased the option of his making the stipulated payments, and thus continuing the insurance from year to year, and is in this respect an executory contract. *Worthington* v. *Charter Oak Life Ins. Co.*, 41 Conn. 372. The provisions requiring payment of the agreed premium for each subsequent year are an essential part of the substance of the contract, by which the duration of the risk is limited and defined, and are not a condition in the nature of a penalty. *Dean* v. *Nelson*, 10 Wall.

* The arguments submitted by the counsel separately are presented as a whole, no attempt being made to assign to each what he chiefly or alone may have said. The point as to the surrender value of the policy was, however, made by *Mr. Garfield*, in his concluding argument for the companies.

158. They declare that the policy, if the requisite premium is not paid, expires by its own limitation; but if the court considers that they create a condition, then we insist that it is a condition *precedent* to the renewal and extension of the risk. Until its performance, no liability is incurred by the underwriter, and no right vests in the policy-holder. *Want et al.* v. *Blunt et al.*, 12 East, 183; *Phœnix Life Ins. Co.* v. *Sheridan,* 8 Ho. of Lds. Cas. 745; Law R. 9 Ch. 502; id. 9 Eq. 705; id. 17 Eq. 316–320. An impossibility to perform it does not prevent the loss which results therefrom; nor will a court of equity relieve against the consequences of a breach, although such impossibility be occasioned by law. Salk. 231, 233; 3 Vern. 338, 339, 344; 1 id. 223; 1 Bro. Ch. 168; *Earl of Shrewsbury* v. *Scott,* 6 C. B. N. s. 1; *Barker* v. *Hodgson,* 3 M. & S. 267.

From the beginning of the war until the President's proclamation of Aug. 6, 1861, the assured, who lived within the rebel States, had full opportunity and permission to withdraw to loyal territory. His duty in such a case is clearly indicated in *Mrs. Alexander's Cotton,* 2 Wall. 421, and *The William Bagley,* 5 id. 377. He elected to remain within the jurisdiction of the enemy. The result of his choice cannot be pleaded as an excuse for non-performance; nor can relief be claimed on the ground insisted upon by the other side, that, when the annual premium became due, its payment was rendered unlawful by the existence of war.

The contract, under the circumstances, and by his own voluntary act, was, if for no other reason, made void by the war; because its continued existence depended upon the performance of certain conditions by a person who remained within the Confederate lines, when all intercourse was prohibited by law. *Hanger* v. *Abbott,* 6 Wall. 536; Duer on Insurance, 473, note 2; *Thompson* v. *United States,* 15 Wall. 400. As insurance of the property or lives of enemies violates the laws of war, all such continuing policies are annulled when hostilities commence between the countries where the insurance company and the assured respectively reside. The war, *ipso facto,* dissolved the contracts sued on. *Furtado* v. *Rogers,* 3 Bos. & Pull. 191. There can be no well-founded distinction between a promise

to indemnify a hostile country and one to indemnify its citizen or subject, though a non-combatant, against loss of life. Upon his death, should the contract be valid, and the non-performance of the condition which he has assumed be waived, an absolute right to a sum of money accrues, even though payment might not be enforced until the close of the war. We also insist, that during the war, and when the insured died, the contract, by its own limitation, or by reason of the non-performance of the condition, ceased and determined. The ground taken on the other side is, that only the particular clause requiring the stipulated annual payment was suspended, and that no loss arises from a non-compliance with its terms. This extraordinary result then follows. The contract, so far as the company is concerned, remains in force, and absolutely binds it, whilst the enemy is excused from performance. Should the insured survive the war, there would be no obligation to pay the back premiums, the contract being unilateral; if he dies, the assured can claim, as is done in these cases, the amount of the policy.

But if the court should reject these views, and hold that the defences are not a valid bar to a recovery in these suits, it will not affirm the judgments and decree for the entire amount of the several policies. If any equitable adjustment of the matters in controversy be made, the policy-holder, whose policy was alive when the war began, should not be entitled to any thing beyond its surrender value at that date. Such an adjustment would not impose on the assured the forfeiture of the premiums paid, or on the company the hardship of paying all lapses, whether voluntary or involuntary.

*Mr. Clinton L. Rice* for the appellees in the first case, and *Mr. Joseph Casey* for the defendant in error in the second. The third case was submitted by *Mr. W. P. Harris* for the defendant in error.

A contract of insurance, when made upon and for the life of the insured, is a contract for life, and not from year to year. *Manhattan Life Ins. Co.* v. *Warwick,* 20 Gratt. 620 ; *Reese* v. *Mut. Benefit Life Ins. Co.,* 26 Barb. 556 ; *Hodson's Adm'rs* v. *Guard. Life Ins. Co.,* 97 Mass. 144; *Hillyard* v. *Mut. Benefit Ins. Co.,* 37 N. J. 444. The payment of the premiums is a

condition subsequent, the performance of which is excused when rendered illegal by the interdiction of commerce and intercourse in time of war between the countries where the contracting parties respectively reside.

It is not an executory contract of such a nature as to be *ipso facto* terminated or abrogated by a state of war. The war did not, therefore, *proprio vigore*, annul it, or impair any vested right under it. It had no other effect than to suspend the remedy upon, or the performance of, it. *Statham* v. *New York Life Ins. Co.*, 45 Miss. 592; *Cohen* v. *New York Mut. Life Ins. Co.*, 50 N. Y. 610; *Sands* v. *New York Life Ins. Co.*, id. 626; *Manhattan Life Ins. Co.* v. *Warwick, supra; New York Life Ins. Co.* v. *Clopton*, 7 Bush, 179; *Hamilton* v. *New York Mut. Life Ins. Co.*, 9 Blatch. 234; *Semmes* v. *Hartford Ins. Co.*, 13 Wall. 158; *Griswold* v. *Waddington*, 16 Johns. 438; Bliss on Life Ins. (2d ed.) pp. 657–702. Conditions are void, if, at the time of their creation, their performance is impossible, or afterwards becomes so, by the act of God or the law. *Walker* v. *Osgood*, 53 Me. 432; *Wood* v. *Edwards*, 19 Johns. 205; *Glover* v. *Taylor*, 41 Ala. 124; *People* v. *Bartlett*, 3 Hill, 570; Story's Eq. sects. 1304, 1307; *Brewster* v. *Kitchen*, 1 Ld. Raym. 317; Coke's Com. 206 *a;* 2 Pars. on Contr. 672–674. The non-performance of a condition subsequent, where its performance is a forbidden and unlawful act, does not work a forfeiture of the policy. There is no forfeiture, in the just sense of that term, where the law prohibits performance (*Semmes* v. *Hartford Ins. Co., supra; Dean* v. *Nelson*, 10 Wall. 169; *Brewster* v. *Kitchen, supra; Tenlevey* v. *Hubbard*, 3 B. & P. 291); and every intendment consistent with the contract will be made to prevent a forfeiture. *McAllister* v. *N. E. Mut. Life Ins. Co.*, 101 Mass. 558; *N. E. Mut. Life Ins. Co.* v. *Hasbrook*, 32 Ind. 447; *Helme* v. *Phila. Life Ins. Co.*, 61 Penn. 107; Bliss on Life Ins., sects. 186, 190; *Thompson* v. *St. Louis Mut. Life Ins. Co.*, 52 Mo. 469. On the cessation of hostilities, the former state of things revived, and rights under a valid contract were restored to their original vigor. *United States* v. *Grossmeyer*, 9 Wall. 72; *Montgomery* v. *United States*, 15 id. 395; *United States* v. *Lapene*, 17 id. 601.

MR. JUSTICE BRADLEY, after stating the case, delivered the opinion of the court.

We agree with the court below, that the contract is not an assurance for a single year, with a privilege of renewal from year to year by paying the annual premium, but that it is an entire contract of assurance for life, subject to discontinuance and forfeiture for non-payment of any of the stipulated premiums. Such is the form of the contract, and such is its character. It has been contended that the payment of each premium is the consideration for insurance during the next following year, — as in fire policies. But the position is untenable. It often happens that the assured pays the entire premium in advance, or in five, ten, or twenty annual instalments. Such instalments are clearly not intended as the consideration for the respective years in which they are paid ; for, after they are all paid, the policy stands good for the balance of the life insured, without any further payment. Each instalment is, in fact, part consideration of the entire insurance for life. It is the same thing, where the annual premiums are spread over the whole life. The value of assurance for one year of a man's life when he is young, strong, and healthy, is manifestly not the same as when he is old and decrepit. There is no proper relation between the annual premium and the risk of assurance for the year in which it is paid. This idea of assurance from year to year is the suggestion of ingenious counsel. The annual premiums are an annuity, the present value of which is calculated to correspond with the present value of the amount assured, a reasonable percentage being added to the premiums to cover expenses and contingencies. The whole premiums are balanced against the whole insurance.

But whilst this is true, it must be conceded that promptness of payment is essential in the business of life insurance. All the calculations of the insurance company are based on the hypothesis of prompt payments. They not only calculate on the receipt of the premiums when due, but on compounding interest upon them. It is on this basis that they are enabled to offer assurance at the favorable rates they do. Forfeiture for non-payment is a necessary means of protecting themselves from embarrassment. Unless it were enforceable, the business

would be thrown into utter confusion. It is like the forfeiture of shares in mining enterprises, and all other hazardous undertakings. There must be power to cut off unprofitable members, or the success of the whole scheme is endangered. The insured parties are associates in a great scheme. This associated relation exists whether the company be a mutual one or not. Each is interested in the engagements of all; for out of the coexistence of many risks arises the law of average, which underlies the whole business. An essential feature of this scheme is the mathematical calculations referred to, on which the premiums and amounts assured are based. And these calculations, again, are based on the assumption of average mortality, and of prompt payments and compound interest thereon. Delinquency cannot be tolerated nor redeemed, except at the option of the company. This has always been the understanding and the practice in this department of business. Some companies, it is true, accord a grace of thirty days, or other fixed period, within which the premium in arrear may be paid, on certain conditions of continued good health, &c. But this is a matter of stipulation, or of discretion, on the part of the particular company. When no stipulation exists, it is the general understanding that time is material, and that the forfeiture is absolute if the premium be not paid. The extraordinary and even desperate efforts sometimes made, when an insured person is *in extremis*, to meet a premium coming due, demonstrates the common view of this matter.

The case, therefore, is one in which time is material and of the essence of the contract. Non-payment at the day involves absolute forfeiture, if such be the terms of the contract, as is the case here. Courts cannot with safety vary the stipulation of the parties by introducing equities for the relief of the insured against their own negligence.

But the court below bases its decision on the assumption that, when performance of the condition becomes illegal in consequence of the prevalence of public war, it is excused, and forfeiture does not ensue. It supposes the contract to have been suspended during the war, and to have revived with all its force when the war ended. Such a suspension and revival do take place in the case of ordinary debts. But have they

ever been known to take place in the case of executory contracts in which time is material? If a Texas merchant had contracted to furnish some Northern explorer a thousand cans of preserved meat by a certain day, so as to be ready for his departure for the North Pole, and was prevented from furnishing it by the civil war, would the contract still be good at the close of the war five years afterwards, and after the return of the expedition? If the proprietor of a Tennessee quarry had agreed, in 1860, to furnish, during the two following years, ten thousand cubic feet of marble, for the construction of a building in Cincinnati, could he have claimed to perform the contract in 1865, on the ground that the war prevented an earlier performance?

The truth is, that the doctrine of the revival of contracts suspended during the war is one based on considerations of equity and justice, and cannot be invoked to revive a contract which it would be unjust or inequitable to revive.

In the case of life insurance, besides the materiality of time in the performance of the contract, another strong reason exists why the policy should not be revived. The parties do not stand on equal ground in reference to such a revival. It would operate most unjustly against the company. The business of insurance is founded on the law of averages; that of life insurance eminently so. The average rate of mortality is the basis on which it rests. By spreading their risks over a large number of cases, the companies calculate on this average with reasonable certainty and safety. Any thing that interferes with it deranges the security of the business. If every policy lapsed by reason of the war should be revived, and all the back premiums should be paid, the companies would have the benefit of this average amount of risk. But the good risks are never heard from; only the bad are sought to be revived, where the person insured is either dead or dying. Those in health can get new policies cheaper than to pay arrearages on the old. To enforce a revival of the bad cases, whilst the company necessarily lose the cases which are desirable, would be manifestly unjust. An insured person, as before stated, does not stand isolated and alone. His case is connected with and corelated to the cases of all others insured by the same company.

The nature of the business, as a whole, must be looked at to understand the general equities of the parties.

We are of opinion, therefore, that an action cannot be maintained for the amount assured on a policy of life insurance forfeited, like those in question, by non-payment of the premium, even though the payment was prevented by the existence of the war.

The question then arises, Must the insured lose all the money which has been paid for premiums on their respective policies? If they must, they will sustain an equal injustice to that which the companies would sustain by reviving the policies. At the very first blush, it seems manifest that justice requires that they should have some compensation or return for the money already paid, otherwise the companies would be the gainers from their loss; and that from a cause for which neither party is to blame. The case may be illustrated thus: Suppose an inhabitant of Georgia had bargained for a house, situated in a Northern city, to be paid for by instalments, and no title to be made until all the instalments were paid, with a condition that, on the failure to pay any of the instalments when due, the contract should be at an end, and the previous payments forfeited; and suppose that this condition was declared by the parties to be absolute and the time of payment material. Now, if some of the instalments were paid before the war, and others accruing during the war were not paid, the contract, as an executory one, was at an end. If the necessities of the vendor obliged him to avail himself of the condition, and to resell the property to another party, would it be just for him to retain the money he had received? Perhaps it might be just if the failure to pay had been voluntary, or could, by possibility, have been avoided. But it was caused by an event beyond the control of either party, — an event which made it unlawful to pay. In such case, whilst it would be unjust, after the war, to enforce the contract as an executory one against the vendor, contrary to his will, it would be equally unjust in him, treating it as ended, to insist upon the forfeiture of the money already paid on it. An equitable right to some compensation or return for previous payments would clearly result from the circumstances of the case. The money paid by the purchaser, subject to the

value of any possession which he may have enjoyed, should, *ex æquo et bono*, be returned to him.   This would clearly be demanded by justice and right.

And so, in the present case, whilst the insurance company has a right to insist on the materiality of time in the condition of payment of premiums, and to hold the contract ended by reason of non-payment, they cannot with any fairness insist upon the condition, as it regards the forfeiture of the premiums already paid ; that would be clearly unjust and inequitable. The insured has an equitable right to have this amount restored to him, subject to a deduction for the value of the assurance enjoyed by him whilst the policy was in existence ; in other words, he is fairly entitled to have the equitable value of his policy.

As before suggested, the annual premiums are not the consideration of assurance for the year in which they are severally paid, for they are equal in amount ; whereas, the risk in the early years of life is much less than in the later.   It is common knowledge, that the annual premiums are increased with the age of the person applying for insurance.   According to approved tables, a person becoming insured at twenty-five is charged about twenty dollars annual premium on a policy of one thousand dollars, whilst a person at forty-five is charged about thirty-eight dollars.   It is evident, therefore, that, when the younger person arrives at forty-five, his policy has become, by reason of his previous payments, of considerable value.   Instead of having to pay, for the balance of his life, thirty-eight dollars per annum, as he would if he took out a new policy on which nothing had been paid, he has only to pay twenty dollars.   The difference (eighteen dollars per annum during his life) is called the equitable value of his policy. The present value of the assurance on his life exceeds by this amount what he has yet to pay.   Indeed, the company, if well managed, has laid aside and invested a reserve fund equal to this equitable value, to be appropriated to the payment of his policy when it falls due.   This reserve fund has grown out of the premiums already paid.   It belongs, in one sense, to the insured who has paid them, somewhat as a deposit in a savings-bank is said to belong to the person who made the deposit.

Indeed, some life-insurance companies have a standing regulation by which they agree to pay to any person insured the equitable value of his policy whenever he wishes it; in other words, it is due on demand. But whether thus demandable or not, the policy has a real value corresponding to it, — a value on which the holder often realizes money by borrowing. The careful capitalist does not fail to see that the present value of the amount assured exceeds the present value of the annuity or annual premium yet to, be paid by the assured party. The present value of the amount assured is exactly represented by the annuity which would have to be paid on a new policy; or, thirty-eight dollars per annum in the case supposed, where the party is forty-five years old; whilst the present value of the premiums yet to be paid on a policy taken by the same person at twenty-five is but little more than half that amount. To forfeit this excess, which fairly belongs to the assured, and is fairly due from the company, and which the latter actually has in its coffers, and to do this for a cause beyond individual control, would be rank injustice. It would be taking away from the assured that which had already become substantially his property. It would be contrary to the maxim, that no one should be made rich by making another poor.

We are of opinion, therefore, first, that as the companies elected to insist upon the condition in these cases, the policies in question must be regarded as extinguished by the non-payment of the premiums, though caused by the existence of the war, and that an action will not lie for the amount insured thereon.

Secondly, that such failure being caused by a public war, without the fault of the assured, they are entitled *ex æquo et bono* to recover the equitable value of the policies with interest from the close of the war.

It results from these conclusions that the several judgments and the decree in the cases before us, being in favor of the plaintiffs for the whole sum assured, must be reversed, and the records remanded for further proceedings. We perceive that the declarations in the actions at law contain no common or other counts applicable to the kind of relief which, according to our decision, the plaintiffs are entitled to demand; but as the question is one of first impression, in which the parties were necessarily some-

what in the dark with regard to their precise rights and remedies, we think it fair and just that they should be allowed to amend their pleadings. In the equitable suit, perhaps, the prayer for alternative relief might be sufficient to sustain a proper decree ; but, nevertheless, the complainants should be allowed to amend their bill, if they shall be so advised.

In estimating the equitable value of a policy, no deduction should be made from the precise amount which the calculations give, as is sometimes done where policies are voluntarily surrendered, for the purpose of discouraging such surrenders ; and the value should be taken as of the day when the first default occurred in the payment of the premium by which the policy became forfeited. In each case the rates of mortality and interest used in the tables of the company will form the basis of the calculation.

*The decree in the equity suit and the judgments in the actions at law are reversed, and the causes respectively remanded to be proceeded with according to law and the directions of this opinion.*

### Mr. Chief Justice Waite.

I agree with the majority of the court in the opinion that the decree and judgments in these cases should be reversed, and that the failure to pay the annual premiums as they matured put an end to the policies, notwithstanding the default was occasioned by the war; but I do not think that a default, even under such circumstances, raises an implied promise by the company to pay the assured what his policy was equitably worth at the time. I therefore dissent from that part of the judgment just announced which remands the causes for trial upon such a promise.

### Mr. Justice Strong.

While I concur in a reversal of these judgments and the decree, I dissent entirely from the opinion filed by a majority of the court. I cannot construe the policies as the majority have construed them. A policy of life insurance is a peculiar contract. Its obligations are unilateral. It contains no undertaking of the assured to pay premiums: it merely gives him an option to pay or not, and thus to continue the obligation of

the insurers, or terminate it at his pleasure. It follows that the consideration for the assumption of the insurers can in no sense be considered an annuity consisting of the annual premiums. In my opinion, the true meaning of the contract is, that the applicant for insurance, by paying the first premium, obtains an insurance for one year, together with a right to have the insurance continued from year to year during his life, upon payment of the same annual premium, if paid in advance. Whether he will avail himself of the refusal of the insurers, or not, is optional with him. The payment *ad diem* of the second or any subsequent premium is, therefore, a condition precedent to continued liability of the insurers. The assured may perform it or not, at his option. In such a case, the doctrine that accident, inevitable necessity, or the act of God, may excuse performance, has no existence. It is for this reason that I think the policies upon which these suits were brought were not in force after the assured ceased to pay premiums. And so, though for other reasons, the majority of the court holds; but they hold, at the same time, that the assured in each case is entitled to recover the surrender, or what they call the equitable, value of the policy. This is incomprehensible to me. I think it has never before been decided that the surrender value of a policy can be recovered by an assured, unless there has been an agreement between the parties for a surrender; and certainly it has not before been decided that a supervening state of war makes a contract between private parties, or raises an implication of one.

MR. JUSTICE CLIFFORD, with whom concurred MR. JUSTICE HUNT, dissenting.

Where the parties to an executory money-contract live in different countries, and the governments of those countries become involved in public war with each other, the contract between such parties is suspended during the existence of the war, and revives when peace ensues; and that rule, in my judgment, is as applicable to the contract of life insurance as to any other executory contract. Consequently, I am obliged to dissent from the opinion and judgment of the court in these cases.