## NEW YORK LIFE INS. CO. v. SLOCUM.

(Circuit Court of Appeals, Third Circuit. February 15, 1910.)

No. 1,263.

1. INSURANCE (§ 349*)—LIFE INSURANCE—NONFORFEITABLE POLICY—PREMIUMS—FAILURE TO PAY—TERMINATION.

A nonforfeitable policy provided that, if insured was indebted to the company, and any premium on the policy or interest on a loan was not duly paid, and a request for paid-up insurance was made, the policy would be indorsed for such amount as any excess of the reserve held by the company over such indebtedness would purchase according to the company's published table of single premiums, and that, if there was no request for paid-up insurance, then the net amount that would have been payable as a death claim on the date to which the premiums were duly paid would automatically continue as term insurance from such date for such time as the excess of the reserve would purchase according to the company's present published table of single premiums for term insurance and no longer. *Held*, that where the excess of reserve over a loan granted on a policy was practically nothing, amounting at most to only $5.80, which would have purchased term insurance for not more than eight days after the annual premium date, a failure to pay a current premium until after the expiration of such time precluded a recovery on the policy in case of insured's death.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 891; Dec. Dig. § 349.*]

2. INSURANCE (§ 349*)—PREMIUMS—NONPAYMENT—LOANS.

A premium note, executed to continue a policy, provided that no part of the premium had been paid, · but that the insurance should continue in force until midnight of the due date of·the note, and, if the note was paid on or before the date when due, the payment, together with the cash received, would be accepted in payment of the premium. The agent accepting the note informed insured's wife that the amount of cash received at the time the note was executed would extend the policy until May 27, 1908, which was after insured died, if the note signed by insured was delivered prior to the expiration of the days of grace. Insured, however, was too ill to sign the note, and it was not signed or delivered until after the expiration of such grace. *Held*, that the policy was terminated.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 897; Dec. Dig. § 349.*]

3. ESTOPPEL (§ 55*)—ESTOPPEL IN PAIS—RELIANCE.

An estoppel in pais is not created except by conduct which the person pleading the estoppel has a right to rely on and does rely on in fact.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 136–141; Dec. Dig. § 55.*]

Buffington, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

Action by Lillian F. Slocum, as executrix of Alexander W. Slocum, deceased, against the New York Life Insurance Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded, with instructions.

George B. Gordon and James H. McIntosh, for plaintiff in error.
George E. Shaw, for defendant in error.

Before GRAY, BUFFINGTON, and LANNING, Circuit Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

LANNING, Circuit Judge. This is an action on a life insurance policy for $20,000. The jury rendered a verdict for the plaintiff below, the defendant in error here, for the sum of $18,224.02, which they ascertained by the following calculation:

| | | |
|---|---:|---:|
| Amount of policy................................................. | | $20,000 00 |
| Loan deducted...................................... | $2,360 00 | |
| Note deducted..................................... | 434 00 | |
| | | 2,794 00 |
| | | $17,206 00 |
| Interest added from Jan. 17, 1908............................. | | 1,018 02 |
| | | $18,224 02 |

We think the errors assigned may all be disposed of by considering the single question whether, under the terms of the policy and the evidence, it was legally possible for the jury to find that the policy was, at the date of the death of the insured, a valid subsisting contract of insurance for any sum whatever.

The policy was dated January 16, 1900. It provided for the payment by the insured of a premium of $579.60 on the 27th day of November in each year during its continuance. It also contained the following provisions:

"This policy is automatically nonforfeitable from date of issue as follows: * * * Second. If any premium or interest is not duly paid, and if there is an indebtedness to the company, this policy will be indorsed for such amount of paid-up insurance as any excess of the reserve held by the company over such indebtedness will purchase according to the company's present published table of single premiums, on written request therefor within six months from the date to which premiums were duly paid. If no such request for paid-up insurance is made, the net amount that would have been payable as a death claim on the date to which premiums were duly paid will automatically continue as term insurance from such date for such time as said excess of the reserve will purchase according to the company's present published table of single premiums for term insurance, and no longer."

"Grace in Payment of Premiums.—A grace of one month, during which the policy remains in force, will be allowed in payment of all premiums except the first, subject to an interest charge at the rate of five per cent. per annum."

"General Provisions.—(1) Only the president, a vice president, the actuary or the secretary has power in behalf of the company to make or modify this or any contract of insurance, or to extend the time for paying any premium, and the company shall not be bound by any promise or representation heretofore or hereafter given by any person other than the above. (2) Premiums are due and payable at the home office, unless otherwise agreed in writing, but may be paid to an agent producing receipts signed by one of the above-named officers and countersigned by the agent. If any premium is not paid on or before the day when due, or within the month of grace, the liability shall be only as hereinbefore provided for such case."

At the date of the issuance of the policy, the insured, Alexander W. Slocum, was a resident of Pittsburgh, and the policy was delivered to him by the insurance company's Pittsburgh agent. The premiums from 1900 to 1906, inclusive, were paid at the company's Pittsburgh office to the company's Pittsburgh agent. In May, 1906, Mr. Slocum took up his residence temporarily, for business purposes, in Houston, Tex. His wife remained, except during a part of the winter of 1906–07, in Pittsburgh. On December 1, 1906, she, acting for her husband,

went to the company's Pittsburgh office and there obtained from the company for her husband a loan of $2,360, out of which the premium due the preceding November 27th was paid. She thereupon delivered to the company a "policy loan agreement," signed by her husband, by which he admitted that he had that day, December 1st, received such loan in cash, and that he had pledged his policy with the company as collateral security therefor. It was stipulated by the agreement that interest on the loan at the rate of 5 per centum per annum should be annually paid in advance, and that the loan should become due and payable (inter alia) if any premium on the policy or interest on the loan should not be paid when due, in which event the pledge should be foreclosed by satisfying the loan in the manner provided in the policy.

The insured died December 31, 1907. His wife claims that on December 27, 1907—that is, on the last day of the month of grace succeeding November 27, 1907—she, acting for her husband, paid to the company's Pittsburgh agent the sum of $264.20 on an agreement hereafter referred to. It is conceded that nothing more was paid to the company during the lifetime of the insured. Passing, for the moment, the consideration of the alleged agreement under which the insured's wife claims to have paid the $264.20, it is clear that if nothing had been paid, and the case should be determined strictly in accordance with the terms of the policy and of the "policy loan agreement," there would be nothing whatever due on the policy. It is provided in the policy, as shown in the above quotations from it, that if the insured be indebted to the company, and any premium on the policy or interest on a loan is not duly paid, and a request for paid-up insurance is made, the policy will be indorsed for such amount of paid-up insurance as any excess of reserve held by the company over such indebtedness will purchase according to the company's published table of single premiums, and that, if there be no request for paid-up insurance, then "the net amount that would have been payable as a death claim on the date to which premiums were duly paid will automatically continue as term insurance from such date for such time as said excess of the reserve will purchase according to the company's present published table of single premiums for term insurance, and no longer.".

In the case at bar, the excess of reserve over the loan of $2,360 was practically nothing. The reserve, on the American 3 per cent. basis, would have been $118.29 per $1,000, or $2,365.80 on the policy of $20,000. The company estimated the reserve at $118 per $1,000, or $2,360 on the policy of $20,000. It had loaned to the insured the whole of this estimated reserve. Giving to the insured, however, the benefit of a reserve of $118.29 per $1,000, the excess of reserve over the amount of the loan, $5.80, would have purchased term insurance for an extended period of not more than eight days after November 27, 1907. Such is the undisputed testimony in the case. If there had been no payment of any part of the premium which became due on November 27, 1907, and no loan against the policy by the company to the insured on that date, the reserve would have carried the policy for the sum of $4,000, according to one of its provisions not quoted, for a period of seven years and seven months beyond November 27, 1907. As there was a loan of $2,360 against it, and that loan exhausted the reserve,

except as to the sum of $5.80, the policy, unless saved by the agreement presently to be considered, expired by force of its own provisions on December 27, 1907, since that was the last grace day and the excess of reserve ($5.80) would not have carried the policy beyond that day.

It is contended, however, by the counsel for Mrs. Slocum, that she paid the $264.20 to the Pittsburgh agent under an agreement that, by the payment of that sum, the policy should be continued in force until May 27, 1908. There is a dispute as to whether the $264.20 was paid by Mrs. Slocum to the company's agent at Pittsburgh or mailed by her to the company's agent at St. Louis, and also as to the conversation between her and the Pittsburgh agent at the Pittsburgh office in the latter part of November and the latter part of December, 1907. We shall assume, as in view of the trial court's charge to the jury we think we must do, that the jury found the facts to be as stated by Mrs. Slocum. Her statement, in substance, is that on November 26, 1907, her husband then being returned to Pittsburgh from Houston, Tex., and being ill, she called at the office of the company's Pittsburgh agent, and was there given by the same person to whom she had in previous years paid the premiums for her husband a memorandum showing that upon the payment by the insured of $264.20 in cash, and the giving of a note for $434.90 payable May 27, 1908, the cash payment would carry the policy until May 27, 1908, and the note would carry it for the balance of the year; and that she took the memorandum to her home, and on December 27, 1907, returned to the office, gave the agent a check for $264.20, and received from him a blank note to be signed by her husband. This part of the transaction she states in the following language:

"I gave him the check for $264.20, and he handed me the blue note and another paper in an envelope, and he said that the note must be signed and I must return it. I told him Mr. Slocum was ill, and it might be several days before I could send it back, and he said that would be all right. 'Mail it as soon as you can.'"

The note was one of the form of notes prescribed by the company, called "blue notes," and was drawn for $435, payable on or before May 27, 1908, without grace and without demand or notice, with interest at the rate of 5 per centum per annum. It contained a recital that it was accepted at the request of the maker, together with $145.60 in cash, which, with the $435 for which the note was drawn, amounted, it will be observed, to $1 more than the premium due. The note contained, also, this provision:

"That although no part of the premium due on the 27th day of November, 1907, under policy No. 3,011,158, issued by said company on the life of A. W. Slocum has been paid, the insurance thereunder shall be continued in force until midnight of the due date of said note; that if this note is paid on or before the date when it becomes due, such payment, together with said cash, will then be accepted by said company as payment of said premium, and all rights under said policy shall thereupon be the same as if said premium had been paid when due; that if this note is not paid on or before the day it becomes due it shall thereupon automatically cease to be a claim against the maker, and said company shall retain said cash as part compensation for the rights and privileges hereby granted, and all rights under said policy, shall be the same as if said cash had not been paid nor this agreement made."

It will be observed, further, that, after deducting from the check of $264.20 the cash item of $145.60 mentioned in the note, there remained $118.60, being 60 cents in excess of the interest on the loan of $2,360 for one year at 5 per centum.

Having made the payment of $264.20 and received the blank note, Mrs. Slocum went to her home, but found her husband too ill to sign the note. He died, as already stated, on December 31, 1907, without having signed it.

Similar notes for part of the premiums due had been given in previous years and delivered to the Pittsburgh agent; but, so far as the case shows, they had always been signed by Mr. Slocum and delivered to the company's agent before the expiration of the grace periods of one month after the due dates of the premiums. While the company would doubtless have been estopped from denying the right of the Pittsburgh agent to extend the policy until May 27, 1908, if the note, duly signed by Mr. Slocum, as well as the check, had been delivered to the Pittsburgh agent on December 27, 1907, notwithstanding the provision of the policy that only the president, a vice president, the actuary, or the secretary of the company had the power to extend the time for paying any premium, since such extensions had been made in previous years without objection on the part of the company, no estoppel in pais can be created except by conduct which the person setting up the estoppel has the right to rely upon and does in fact rely and act upon. Bloomfield v. Charter Oak Bank, 121 U. S. 135, 7 Sup. Ct. 865, 30 L. Ed. 923.

In the present case, the contract between the company and the insured provided that only the company's president, or one of its vice presidents, or its actuary, or its secretary, should have power to extend the time for paying a premium. In former years, that provision had been disregarded to the extent of allowing an agent of the company to grant additional time for paying a premium provided the additional time was actually granted within the grace period of one month. An attempt was made to show that the Pitsburgh agent had extended the time for the payment of a premium on a policy of Mr. Slocum's brother more than two months after the premium became due. It was shown, however, that the agent acted in that case after notification from the home office of the company in New York that the policy had been reinstated. Furthermore, it must be borne in mind that Mrs. Slocum, according to her own testimony, was told by the Pittsburgh agent on December 27, 1907, when he handed the blank note to her, that it must be signed by Mr. Slocum and returned to the agent. The contract between her and the company's agent, even on her own showing, was never completed. It remained executory. It was not a divisible, but an indivisible, contract. If she should get the note signed by her husband, and mail it to the agent as soon as she could, then, assuming the power of the agent to enter into such an arrangement, the $264.20 would carry the policy until May 27, 1908, and the note would carry it for the rest of the year.

It will be observed, further, that according to the terms of the blank note given to Mrs. Slocum the $145.60 paid on December 27, 1907, was not received as part of the premium due on November 27th pre-

ceding, for the note declares that no part of the premium had been paid. The note itself was the thing that embodied the only contract that, so far as the record shows, the agent had the power to make. It declares that, if the note should be paid at its maturity, the amount of it, with the $115.60 paid in cash on December 27, 1907, would then be accepted as payment of the premium, and that, if the note should not be paid at maturity, the cash payment of $145.60 should be retained by the company as part compensation for the rights and privileges thereby granted. If the note had been signed and delivered on December 27, 1907, it, with the cash payment of $145.60, would have continued the policy until May 27, 1908, notwithstanding the provision of the policy that no one but the president, a vice president, the actuary, or the secretary, could extend the time for paying the premium, for the reason that extensions made on such terms in previous years had been ratified and authorized by the company. The note would then have been a good contract supported by a good consideration. But the acceptance by the Pittsburgh agent, on December 27, 1907, of $264.20 ($118.60 of which was for interest and the remaining $145.60 for the purpose above stated), without any note whatever, was an unprecedented transaction. The company does not claim the money, and it tendered it back to Mrs. Slocum before her action was commenced. Mrs. Slocum could not rightfully infer from any previous transactions with the Pittsburgh agent or with the company that any agent other than the president, a vice president, the actuary, or the secretary had power to make any contract with her for the continuance of the policy from November 27, 1907, to May 27, 1908, on the mere payment of a part of the premium due on the former date.

In Hudson v. Knickerbocker Life Ins. Co., 28 N. J. Eq. 167, it appears that the plaintiff sought to collect the amount alleged to be due on a policy of insurance issued by the defendant to the plaintiff on the life of her husband. A little more than one-half of the premium due on May 28, 1871, was paid in cash. "It is insisted," says Vice Chancellor Van Fleet, "that the acceptance of this sum operated to keep the policy alive for such proportion of the ensuing year as the sum paid bore to the premium for the whole year; in other words, a payment of just half the annual premium would continue the life of the policy for six months. The policy requires the payment, on a day certain, of a specific sum; its payment on the day designated is a condition precedent to the continuance of the policy, and it is expressly provided that a failure to make it destroys the policy. The parties have agreed upon this condition, and the court has no power to modify it, or dispense with it. It is not stipulated a partial payment shall keep the policy alive for such fractional part of a year as the payment bears to the whole premium, and in the absence of such an agreement a partial payment is no better than no payment."

In New York Life Ins. Co. v. Statham, 93 U. S. 24, 23 L. Ed. 789, in the two suits on life insurance policies then before the Supreme Court, Mr. Justice Bradley said:

"All the calculations of the insurance company are based on the hypothesis of prompt payments. They not only calculate on the receipt of the premiums when due, but on compounding interest upon them. It is on this basis that

they are enabled to offer assurance at the favorable rates they do. Forfeiture for nonpayment is a necessary means of protecting themselves from embarrassment. Unless it were enforceable, the business would be thrown into utter confusion. It is like the forfeiture of shares in mining enterprises, and all other hazardous undertakings. There must be power to cut off unprofitable members, or the success of the whole scheme is endangered. The insured parties are associates in a great scheme. This associated relation exists whether the company be a mutual one or not. Each is interested in the engagements of all; for out of the coexistence of many risks arises the law of average, which underlies the whole business. An essential feature of this scheme is the mathematical calculations referred to, on which the premiums and amounts assured are based. And these calculations, again, are based on the assumption of average mortality, and of prompt payments and compound interest thereon. Delinquency cannot be tolerated nor redeemed, except at the option of the company. This has always been the understanding and the practice in this department of business. Some companies, it is true, accord a grace of 30 days, or other fixed period, within which the premium in arrear may be paid, on certain conditions of continued good health, etc. But this is a matter of stipulation, or of discretion, on the part of the particular company. When no stipulation exists, it is the general understanding that time is material, and that the forfeiture is absolute if the premium be not paid. The extraordinary and even desperate efforts sometimes made, when an insured person is in extremis, to meet a premium coming due, demonstrates the common view of this matter."

While forfeiture is not favored in the law, and while we do not adopt the view pressed upon us by the learned counsel for the plaintiff in error that the policy now in suit was in all respects "automatically nonforfeitable," yet we cannot hold the insurance company to have waived a provision of its contract, by reason of an act of one of its agents, when that contract expressly declares that the agent had no authority to do the thing he has done, and there is absolutely no evidence that the company by any of its authorized officers has ever ratified, approved, or acquiesced in the act.

We cannot find in this case any evidence from which the jury could have properly found that the company waived the provisions of the policy except to the extent of allowing its agent at Pittsburgh to grant additional time for paying a premium on receiving from the insured, within the grace period of one month, some cash, and a note for the the full amount of the premium less the cash paid, and, consequently, we find no evidence in support of the alleged estoppel.

The views above expressed are in accord, we think, with what has been said on the binding character of the provisions of an insurance policy, and on forfeiture, waiver, and estoppel, in Assurance Co. v. Building Association, 183 U. S. 308, 22 Sup. Ct. 133, 46 L. Ed. 213; Ætna Life Ins. Co. v. Frierson, 114 Fed. 56, 51 C. C. A. 424; Modern Woodmen of America v. Tevis, 117 Fed. 369, 54 C. C. A. 293; Supreme Council of Royal Arcanum v. Taylor, 121 Fed. 66, 57 C. C. A. 406; Murray v. State Life Ins. Co. (C. C.) 151 Fed. 540, s. c. affirmed, 159 Fed. 408, 86 C. C. A. 344. While in the last of these cases this court held that forfeitures of policies of insurance are not favored in the law, and that "any agreement, declaration, or course of action, on the part of the insurance company, which leads a party honestly to believe that by conforming thereto a forfeiture of his policy will not be incurred, followed by due conformity on his part, will and ought to estop the company from insisting upon a forfeiture, though

it might be claimed under the express letter of the contract," there was, in the case at bar. no agreement, declaration, or course of action, on the part of the insurance company, which justified the insured in assuming that the time for the settlement of his premium due on November 27, 1907, was extended beyond December 27, 1907.

We conclude that there was error in not entering judgment for the defendant non obstante veredicto.

The judgment entered by the Circuit Court is therefore reversed. The record will be remanded, with instructions to enter judgment for the defendant notwithstanding the verdict.

BUFFINGTON, Circuit Judge (dissenting). The policy here in suit provided:

"If any premium is not paid on or before the day when due, or within the month of grace, the liability shall only be as heretofore provided."

And—

"Only the president, a vice president, the actuary, or a secretary has power in behalf of the company to make or modify this or any contract of insurance, or to extend the time of paying any premium."

As the insured had borrowed on the policy to its full capacity, its automatically nonforfeitable clause, referred to above as "heretofore provided," did not apply. Consequently the case turned wholly on forfeiture by reason of nonpayment of the annual premium.

The disputed facts in support of the alleged waiver of forfeiture, as testified to by the insured's wife, were sustained by the verdict. and are therefore accepted as true. This court, in its opinion, holds there was no evidence from which a jury could infer waiver of forfeiture. From that conclusion I differ, and the importance of insistence on the legal principles applicable to waivers of forfeiture and to the right of a jury alone to determine the fact of waiver, in my judgment. warrants me in recording this dissent.

The policy in question was for the whole life of the insured. Upon it he had paid some eight annual premiums, of $579.60 each. The insurance company's right to terminate the contract for nonpayment of premiums was a forfeiture. New York Life Ins. Co. v. Statham, 93 U. S. 24, 23 L. Ed. 789, where it was said:

This "is an entire contract of assurance for life, subject to discontinuance and forfeiture for nonpayment of any of the stipulated premiums. * * * Each installment is, in fact. part consideration of the entire insurance for life. It is the same thing, where the annual premiums are spread over the whole life."

But such forfeitures may not only be waived, but the company— and this it seems to me is the crux of the present case—may by its conduct estop itself from setting up a stipulated ground of forfeiture. In Insurance Company v. Eggleston, 96 U. S. 572, 24 L. Ed. 841, Mr. Justice Bradley said:

"We have recently, in the case of Insurance Company v. Norton, 96 U. S. 234 |24 L. Ed. 689|, shown that forfeitures are not favored in the law, and that courts are always prompt to seize hold of any circumstances that indicate an election to waive a forfeiture, or an agreement to do so on which the party has relied and acted. Any agreement, declaration, or course of action on the

part of an insurance company which leads a party insured honestly to believe that by conforming thereto a forfeiture of his policy will not be incurred, followed by due conformity on his part, will and ought to estop the company from insisting upon the forfeiture, though it might be claimed under the express letter of the contract. The company is thereby estopped from enforcing a forfeiture. The representations, declarations, or acts of an agent, contrary to the terms of the policy, of course, would not be sufficient, unless sanctioned by the company itself. Insurance Company v. Mowry, 96 U. S. 544 [24 L. Ed. 674]. But where the latter has, by its course of action, ratified such declarations, representations, or acts, the case is very different."

The case then turns on the question: Are there in this case any facts, acts, conduct, or circumstances in evidence which "indicate an election to waive a forfeiture"? For, if there are, the courts, as said by Justice Bradley, "are always prompt to seize hold of any circumstances that indicate an election to waive a forfeiture, or an agreement to do so on which the party has relied and acted."

Now, in the present case, the policy provided for the payment of the whole annual premium of $579.60, which matured November 27, 1907, on the extended grace day of December 27, 1907. Nonpayment of such entire amount on the latter day was a ground of forfeiture, and the question was whether the company by its conduct so misled the insured in reference to that premium by accepting a part of the premium that it could not set up nonpayment of the other part as a ground of forfeiture. What are the facts and circumstances of this case bearing on the dividing of this premium and accepting a proportionate part? This company had originated, and in Mr. Slocum's case had in three previous annual premium payments followed, a mode of dividing annual premiums and accepting proportionate parts through the use of what were called blue notes. This system was in general use, and these blue notes were furnished to agencies as the regular printed blanks of the company. Indeed, it was shown by proof on the part of the company that this method of settlement was one which the company authorized its agents to make. To that extent, and especially by its use in three settlements made previously on this particular policy, it impliedly modified or impliedly waived the express provisions of the policy quoted above, which made omission to pay the whole annual premium on the annual due day an unqualified ground of forfeiture, which could only be waived by certain officers. Now, when these so-called blue notes are examined, it will be seen, strange as it may appear, that while ostensibly contracts for the payment of money, they absolutely impose no liability whatever on the maker and confer no right on the payee. Their terms are:

"If this note is not paid on or before the date it becomes due, it shall thereupon automatically cease to be a claim against the maker."

An examination of the whole note discloses its purpose, and that purpose is the important, fundamental fact in this case. Under the terms of the policy, a failure of the insured to pay the whole of his annual premium, which in Mr. Slocum's case amounted to $579.60, on the grace day, forfeited his policy. But the insured might, as was the case with Mr. Slocum, in three previous blue note settlements, be unable to pay more than a proportionate part, say, for example, one-

half the premium, or six months' insurance. But the company could not unconditionally accept such part premium payment, since payment thereof left both insured and insurer in a debatable position. It was unfair to the company, because the insured might contend that such part premium payment was an extension of credit for the nonpaid premium part. On the other hand, it was unfair to the insured, because the company might insist—just, by the way, as it is doing in this case—that the nonpaid part of the premium forfeited the six months' insurance which the part paid premium had actually paid. Now, although the insured could not pay the entire premium, both parties, from the standpoint of their own interests, wanted the policy kept alive—the insurance company to get future premiums, and the insured to get future insurance. In order, therefore, to allow the insured to pay for a part of the year, to carry his insurance for such paid part, and permit him, at the expiration of such paid period, to pay for the insurance for the unpaid rest of the year, if he so selected, but imposing no liability if he did not, this blue note system was devised. Such intent is clearly outlined in the note in these provisions:

"On or before May 27th, after date, without grace, and without demand or notice, I promise to pay to the order of the New York Life Insurance Company four hundred and thirty-four dollars, at the Citizens' Central National Bank of New York, value received, with interest at the rate of five per cent. per annum. This note is accepted by said company at the request of the maker, together with one hundred forty-five and $^{60}/_{100}$ dollars in cash, on the following express agreement: That although no part of the premium due on the 27th day of November, 1907, under policy No. 3011158, issued by said company on the life of Alexander W. Slocum, has been paid, the insurance thereunder shall be continued in force until midnight of the due date of said note; that, if this note is paid on or before the date it becomes due, such payment, together with said cash, will then be accepted by said company as payment of said premium, and all rights under said policy shall thereupon be the same as if said premium had been paid when due; that, if this note is not paid on or before the day it becomes due, it shall thereupon automatically cease to be a claim against the maker, and said company shall retain said cash as part compensation for the rights and privileges hereby granted, and all rights under said policy shall be the same as if said cash had not been paid nor this agreement made."

Now it is clear that the insurance company, by establishing such a system and intrusting the carrying out thereof to its agents, as it did by furnishing them with its notes, either meant to empower the agent in proper cases to waive payment of the entire premium as a requirement to prevent forfeiture, or else was guilty, which, of course. is not the case, of an intent to mislead insurers. It follows, therefore, that, the agent being empowered to use this blue note system, the case resolves itself, not into a question of law as to the existence of a power in the agent to waive forfeiture, but into one of fact, viz., whether the agent used such conceded power in a way to mislead the insured. The existence of a power is usually a question of law, on which a court will give binding instructions; but whether an agent used it, and by its use affected his principal, is as clearly a fact for a jury's determination. In other words, the jury had a right, from the course of conduct of this company, to infer from the creation of this

blue note system that the postponement of part of the premium was intrusted to their agents; and, such being the case, the question whether the agent had exercised that power in a way to mislead the insured was not a question of law for the court, but purely of fact, and therefore for the jury.

Now, the decedent, Slocum, having used this blue note system of settlement for the three preceding annual payments through his wife, she went to the Pittsburgh agency, as she had previously done, a few days before November 27, 1907, as she testified, or before December 27th, as the agent said, and discussed with him as to the payment of the coming annual premium. He suggested, for the determination of herself and her husband, the latter being then ill, two different plans, one of which was the blue note method, which was for the payment in cash of $264.20, which was $118.60 for interest at 5 per cent. in advance for six months from November 27, 1907, on a loan to Mr. Slocum on his policy of $2,360, and $145.60, for the proportional part of the premium for six months. Mrs. Slocum testified the agent said:

"That if I paid $264.20, and gave a note for the balance, which was $434, to be paid on the 27th day of May, 1908, that that would carry it; the $264.20 would carry it until May, and the other would carry it for the rest of the year."

At about 11 o'clock of the morning of December 27, 1907, which was the last due day of the premium, Mrs. Slocum again called at the office, told the same agent that they had decided to adopt the blue note plan, and then actually paid him $264.20, agreed upon, by a check of that date of John F. Scott, a family friend, made to the order of Mrs. Slocum, and by her indorsed to the company. No receipt was given her for the money she paid; but the company proceeded to indorse and collect the check, which in itself evidenced her payment. Mrs. Slocum then says:

"I gave him the check for $264.20, and he handed me the blue note, and another paper in an envelope, and he said that the note must be signed, and I must return it. I told him Mr. Slocum was ill, and it might be several days before I could send it back, and he said that would be all right; 'mail it as soon as you can.' * * * I took it home, and before taking off my coat or hat I went upstairs to my room, and Mr. Slocum was lying on the bed. I told him that the insurance had been fixed, and that I had a note for him to sign, and he didn't answer me. He was lying on the bed with his eyes closed, and I repeated it. He opened his eyes, and looked at me, and closed them again. He tried to answer, but he couldn't; and it seemed too brutal, I couldn't talk to him about it. Q. Did he die? A. He died on the 31st. Q. And without signing the note? A. Yes, sir."

Under such facts and circumstances, it seems to me the court below was warranted in charging the jury as it did:

"If by any agreement, declaration, or course of action by and on the part of the representatives of the company with whom this plaintiff was in the habit of dealing, the plaintiff was led honestly to believe that she could settle the premium in the manner claimed by her, and thereupon acted upon this theory and belief, and paid part of the premium due on the policy, as testified to by her, and agreed to return the note as directed by the defendant's representative, that under such conditions, and the facts and circumstances of this case, the defendant should not justly be allowed to interpose the defense of

forfeiture of the policy, nor should the plaintiff thereby be prevented from recovering."

The majority opinion gives no effect to the fact that the premium for six months was actually paid; that the company collected the money, and the transaction was closed, with the understanding that the noncontractual note was to be signed. It treats this case as though it were based on a contract of December 27th, and which was only to come into existence when the blue note was signed. If Mrs. Slocum had paid no money that day, or if the insurance company had simply held the check, and said the closing of the transaction would await the signing of the blue note, there would be ground for giving such effect to such an inchoate arrangement; but we are not dealing with such a state of facts, but with a question of conduct evidencing a waiver of forfeiture founded on money paid by the insurer and collected by the insured, and not with a situation where no consideration had actually passed. The insurance company cashed her check, collected the money, which paid interest it had not earned and insurance for six months. The payment of the apportioned premium by the insured, and its acceptance by the company, were the substantial matters evidencing an intent to waive forfeiture, and not the signing of the blue note, which, as we have seen, imposed absolutely no liability on the insured, and conferred absolutely no right on the insurer. That was a mere matter of formality, and under the circumstances the jury was warranted in finding that both parties regarded it as such. The transaction took place in the city of Pittsburgh near noon on the last permissible day. The policy shows the deceased lived at Bellevue, some miles away from the city. The agent was told Mr. Slocum was ill, and it might be several days before the note could be returned, and to this he said:

"That will be all right; mail it as soon as you can."

Mrs. Slocum omitted nothing she was called on to do. She took the paper to her husband at once, but his condition was such as to preclude him from signing it. No one contemplated it being signed that day, or that its signature was a prerequisite to either party enjoying the benefits of the arrangement, viz., the company getting the premium by cashing the check, and the insured getting the insurance he had paid for. If the omission to sign this noncontractual note is the missing link in the chain of events showing a waiver of forfeiture, then we have an effect given to it which neither the company nor Mrs. Slocum contemplated, else why, if the company regarded the arrangement as incomplete, did it cash the check? The vital question in the case is the fact of forfeiture, and evidence of that is intent. That the company, by the adoption of this blue note system, authorized its agent to accept proportional premiums, cannot be gainsaid.

It follows, therefore, that whether the agent did accept the proportional payment as a pro tanto waiver of forfeiture was a question of fact, depending, just as a question of negligence would, on inferences from conduct, facts, and circumstances, and one, therefore, peculiarly within the province of a jury.