## ZIMMERMANN et al. v. MILLER, Alien Property Custodian, et al.

(District Court, S. D. New York. April 25, 1924. Supplemental Opinion, June 2, 1924.)

1. War ⚖︎12—Court's jurisdiction of action to recover money and property from Alien Property Custodian continues till fund disposed of, even after peace declared.

Where property was sequestered by Alien Property Custodian, character thus given capture continued until after final disposition of fund, and court had jurisdiction of action under Trading with Enemy Act, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), to recover such property from custody, even after peace was declared.

2. War ⚖︎10(1)—Beginning of war does not accelerate maturity of debts.

Beginning of war does not accelerate maturity date of debt between persons living in enemy countries.

3. War ⚖︎10(1)—Maturity date of debt due from alien enemy could not be accelerated in advance of demand.

Under Trading with Enemy Act, § 8a (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½dd), debts of alien enemy to nonenemy did not become due merely because of existence of state of war; but, where terms of contract provided for acceleration of maturity on presentation or demand, nonenemy could make such demand on Alien Property Custodian, and maturity date could not be fixed in advance of actual demand.

4. Account stated ⚖︎9—Statements of "account current" by German bank to American depositor during war period, not rendered till resumption of trade relations, held not accounts stated.

Quarterly statements of "account current" made by German bank during World War to American depositor, which were not actually rendered until after resumption of trade relations, were not "accounts stated," so as to impose duty on bank to make immediate payment of balance, where course of dealing showed payment was not intended to be made until demanded by depositor.

5. War ⚖︎10(1)—Date of American depositor's demand on German bank for payment of balance held to fix maturity date as of which dollar value of account should be determined.

In action under Trading with Enemy Act, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), by American depositor of German bank to recover balance of its deposit account, which is action in the nature of one in rem, depositor's demand on German bank for payment of his deposit out of bank funds in hands of alien property custodian fixed maturity date of bank's obligation as of which dollar value of depositor's account should be determined, notwithstanding restrictions of German law in payment by German bank, and date on which such restrictions were removed was not date of breach.

6. War ⚖︎10(1)—Nonenemy's recovery from alien enemy based on exchange rate on date of breach of obligation, and not on date of judgment.

Exchange rate on date of breach of alien enemy's obligation to pay indebtedness to nonenemy, and not date of judgment, is to be used in computing amount of recovery.

**7. War &#8680;12—Claims against property in possession of Alien Property Custodian cannot be diminished by credits in favor of enemy established subsequent to October 6, 1917, but may be diminished by credits established before such date.**

Under Trading with Enemy Act, § 9 (Comp. St 1918, Comp. St. Ann. Supp. 1919, § 3115½e), claims to property in hands of Alien Property Custodian for indebtedness due from alien enemy cannot be diminished by credits in favor of enemy established after October 6, 1917, but may be diminished by credits established before such date.

### Supplemental Opinion.

**8. War &#8680;10(1)—Date of demand for payment of deposit in German bank fixes date from which interest on indebtedness runs.**

As date of American depositor's demand for payment of deposit balance in German bank fixes maturity date of bank's obligation to pay, interest runs from that date, notwithstanding German law prevented payment of deposit balance.

In Equity. Suit by Leopold Zimmermann and others, copartners doing business under the firm name and style of Zimmermann & Forshay, as brokers, against Thomas W. Miller, as Alien Property Custodian of the United States, and others. Judgment for plaintiffs.

Stockton & Stockton, of New York City (Joseph M. Hartfield and Hamilton Vreeland, Jr., both of New York City, of counsel), for plaintiffs.

William Hayward, U. S. Atty., of New York City (Dean Hill Stanley, Sp. Asst. Atty. Gen., of counsel), for defendants Miller and White.

Peaslee, Brigham & Gennert, of New York City (Thomas G. Haight, of Jersey City, N. J., and Amos J. Peaslee, of New York City, of counsel), for defendant Deutsche Bank.

KNOX, District Judge. In this action, instituted under the provisions of section 9 of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), plaintiffs seek to recover out of seized money or property of the Deutsche Bank of Berlin, Germany, now in the hands of the Alien Property Custodian and the Treasurer of the United States, the dollar value of 3,613,454.30 German marks, as of March or April, 1917. The average cable transfer rate of exchange for United States dollars and German marks, then existing, would give the latter a value of about $623,-317.25. At the time of trial, marks were worth 15 cents per trillion.

The basis of the claim is that there was owing to plaintiffs from the Deutsche Bank upon or about October 1, 1917, the aforesaid number of German marks, and being the balance of a deposit account theretofore opened with the bank. The contention is that the money became due and payable to plaintiff upon the outbreak of the war between the United States and Germany, and not having been remitted by the bank, recoupment, at the pre-war rate of exchange, may here be had.

The Alien Property Custodian and the Treasurer admit that the former having determined the Deutsche Bank to be an alien enemy under the terms of the Trading with the Enemy Act (sections 3115½a–3115½j), and that certain money and other property was owing, or belonging to, held for, by, on account of, and for the benefit of said enemy, within the United States, required the same to be paid to him, to be held, administered, and accounted for as provided by law. The money so received was duly paid into the treasury of the United States. These defendants also plead the pendency of numerous other suits which have been brought against them by other persons, firms, and corporations, who assert the right to collect from the seized money and property of the Deutsche Bank in their hands certain claims which are alleged to be payable therefrom.

The Deutsche Bank, in a separate answer, sets up numerous defenses. Those principally relied upon are the following:

(1) That plaintiffs' claim is not within section 9 of the Trading with the Enemy Act, and the court is therefore without jurisdiction.

(2) That there was no default upon the part of the bank, prior to December 17, 1921, and even assuming the court's jurisdiction, plaintiffs' recovery must be limited to the dollar equivalent of the marks claimed as of that date.

(3) That if plaintiffs are entitled to any claim for damages or compensation for matters beyond the bank's control, they must seek relief through the Mixed Claims Commission appointed pursuant to agreement made between the United States and Germany upon August 10, 1922.

The facts giving rise to the account, and its condition upon the outbreak of the war, are these: Plaintiffs were bankers and brokers who engaged in an extensive foreign business. It was essential for them to maintain considerable deposits in banking houses abroad. In 1908 they opened a deposit and a check account with the Deutsche Bank. The former was intended to record transac-

tions in securities, and the latter was designed as a fund against which drafts, letters of instruction for payments, bills, encashments, etc., might be charged. The original deposit and all subsequent withdrawals were made in terms of German marks. At quarterly intervals from 1908 to the beginning of the year 1916, the bank sent transcripts of the account to plaintiffs. These showed the debits and credits over the preceding quarter, together with the balance remaining upon deposit at the end of the period covered by the statement. The statements were accompanied by a letter in which Zimmermann & Forshay were requested to acknowledge the correctness of the accounts, and such communications bore this notation:

"The conditions governing the business relations of the Deutsche Bank with their clients are as follows:

"(1) * * * All accounts of clients, including special accounts are to be regarded as part of a uniform account current. * * *

"(16) The clients of the Deutsche Bank submit in all disputes, as well as in respect of all claims arising from the connection with the bank, to German law, and to the Court of the Royal County Court (Kgl. Landgericht I) or Amtsgericht, Berlin-Mitte, unless other agreements have been made."

Over the period from 1916 to July 1, 1919, the bank continued to prepare the quarterly statements, but, owing to the uncertainties of communication and prohibitive statutes, the same were not sent to America until the resumption of communication in July, 1919. The accounts carry the transaction between the parties down to December 31, 1917, but inasmuch as suits maintainable under section 9 of the Trading with the Enemy Act are restricted to such debts as were owing to and owned by a claimant, prior to October 6, 1917, declaration is made upon the number of marks standing to plaintiffs' credit as of October 1, 1917.

Immediately before and for some time after April 6, 1917, the date of our entry into the war, the bank made payments from plaintiffs' account to the extent of 898,952 marks. For the most part, these were made pursuant to the instructions of a man named Cale or Cohn, who, it is said, was the Berlin representative of Zimmermann & Forshay. Subsequent to the war, such payments were personally confirmed by one of the plaintiffs. Over the same period, the

account was credited with deposits mailed to the bank prior to April 6, 1917, and subsequently received by it. In addition, a total of 1,639,403 marks, representing the payment of coupons upon German war bonds, owned by plaintiffs, was credited.

Prior to our declaration of war, Zimmermann & Forshay had delivered to various persons orders calling upon the bank to make certain payments. Had such orders been presented before April 6, 1917, and had there been no credits to the account, plaintiffs' balance would have been greatly reduced. The greater portion of such orders were never paid from the accounts existing upon April 6, 1917, because of a "stop order" issued against the same by a German official called the "Treuhander," who seems to have exercised an authority and control not unlike that possessed by our own Alien Property Custodian.

The Treuhander's entry into the situation seems to have occurred about November 10, 1917, at which time a decree relating to enemy property in Germany, theretofore operative as against Great Britain and other enemies, was made applicable to the United States. This decree or subsequent orders and laws of a similar character continued in force until December 18, 1921.

No sooner were communications resumed with Germany than plaintiffs sought to have their outstanding orders honored by the bank. On or about July 19, 1919, in a letter dated June 9, 1919, they sent confirmations of a large number of pre-war orders drawn against the account between October 6, 1916 and April 3, 1917, aggregating close to four million marks. The letter of transmittal concluded:

"We therefore beg of you to carefully compare and examine these copies and ascertain which of the payments have not been made by you and proceed immediately to carry out our instructions and make the payments."

For reasons already stated, the payments from the old accounts could not be made, and to care for the outstanding orders plaintiffs opened new accounts with the bank.

About July 23, 1919, the bank was requested to forward plaintiffs' "account current" from January 1, 1916, to date, with approximate credit balance. At about the same time, the bank was asked to ship such securities as were held for plaintiffs. In answer to their request, the bank replied:

"Shipment securities and disposal old balance about four million eight hundred thirty

nine thousand impossible at present consequence peace conditions."

This was followed by a cable of August 9, 1919, from plaintiffs, which reads:

"Referring your cable July twenty-sixth regarding our old balance. Will you consent to American Alien Property Custodian paying us out of your former funds in his custody equivalent in dollars at March 15, 1917 rate 69 amounting to 834,727. If you agree wire us to that effect and we will send you necessary papers to be filled out and signed by you. This will obviate lawsuit which we otherwise will be compelled to institute."

The bank appealed to the German Department for Foreign Affairs for instructions as to what might be done. It was told that "all intercourse as far as claims and debts are concerned, is forbidden between the parties involved until further notice, so long as this does not take place through the medium of examining and clearing offices. Exceptions to this prohibition have not been provided for. It will therefore not be possible to come to some agreement as to their account as proposed by Zimmermann & Forshay of New York."

The following cable to plaintiff was then sent:

"Cable ninth are informed by our authorities that in consequence of instructions Peace Treaty settlement as you suggested cannot be authorized at present. Therefore matter must be left future arrangement."

The treaty of peace between the United States and Germany was proclaimed November 14, 1921. A month later plaintiffs filed a claim under section 9 of the Trading with the Enemy Act with the Alien Property Custodian, asking for the payment of their claim against the bank out of its funds and property in his hands. The claim not being paid, suit was begun upon February 28, 1922.

Without discussing their nature, I hold that the claims filed by plaintiff with the Custodian in March, 1919, have no relation to the recovery asked in this suit.

[1] The next question for determination is that of the court's jurisdiction.

The objection raised in this behalf is based upon the fact that at the time plaintiffs' claim of November, 1921, was filed, with the Custodian, peace had been restored, and the bank was no longer an alien enemy.

This, I think, is of no moment. The money and property out of which plaintiffs seek payment was sequestered at a time when there was no doubt of the bank being an alien enemy. The character thus given to the capture continues until a final disposition of the fund has been made.

The act expressly provides that suits for the recovery of debts owing from alien enemies, and which existed prior to October 6, 1917, may be instituted notwithstanding the end of the war. The period of limitations within which this privilege might originally be exercised has now been removed. Such action indicates that the change in the status of the aliens whose property was seized, brought about by the ending of the war, was not intended to bar claimants of debts owing from alien enemies upon October 6, 1917, from asserting the same against such of the enemy's money and property as was seized and sequestered by the Custodian.

Coming to a consideration of the facts, it seems plain that prior to April 6, 1917, Zimmermann & Forshay had no desire to receive payment of their funds upon deposit with the bank. Diplomatic relations between the United States and Germany were severed early in the year. With the passing of each day, war was becoming more and more imminent. Nevertheless, up until April 3, 1917, plaintiffs continued to direct the bank to make payments from their account. Even after war had begun they were content to have a portion of the funds applied to the use of Cale or Cohn, and for the support of some members of the Zimmermann family. At the close of the war, plaintiffs undoubtedly believed that the account was still open in their favor, and was available for use in paying orders drawn against it. Hence the haste with which they requested the payment of outstanding orders as soon as communications were permitted to reach Berlin. So far nothing had occurred which could be construed as a demand by plaintiff for the payment of the funds remaining to its credit upon the bank's books.

It was said in Leather Manufacturers' Bank v. Merchants' Bank, 128 U. S. 26, 34, 9 S. Ct. 3, 4 (32 L. Ed. 342): "* * * Proof of refusal or neglect to pay upon * * * demand or order is necessary to sustain an action by the depositor against the bank."

[2] But, say the plaintiffs, "this action in reality is not against the bank and a state of war occasioned a breach of the bank's obligations to pay the credit balances as of April 6, 1917." It is argued that when a contract, made previous to the war with

one who becomes an enemy, requires to be further acted on, not merely is the remedy suspended but the contract is also dissolved because it is unlawful to have communications or trade with an enemy. In support of this, the case, among others, of New York Life Insurance Co. v. Statham, 93 U. S. 24, 23 L. Ed. 789, is cited. As I read the decision, and so far as the same appears applicable to the present state of facts, it may be said to favor the theory that contracts such as existed between plaintiffs and the bank are merely suspended during a state of war, and are to be considered as revived with the coming of peace. In the course of his opinion, Mr. Justice Bradley declared:

"Such a suspension and revival do take place in the case of ordinary debts."

After referring to certain types of contracts which would not survive hostilities, he continues:

"The truth is, that the doctrine of the revival of contracts suspended during the war is one based on considerations of equity and justice, and cannot be invoked to revive a contract which it would be unjust or inequitable to revive."

And so firm was the conviction of the majority of the court that equitable principles should be applied with respect to contracts which were held to be abrogated by the war, it proceeded to hold that the representatives of deceased persons upon whose lives the defendants had issued policies of life insurance were entitled ex æquo et bono to recover the equitable value of the policies, with interest from the close of the war. The case of Brown v. Hiatt, 15 Wall. 177, 21 L. Ed. 128, is authority for the proposition that the beginning of war does not accelerate the date of maturity of debts existing between persons who thus become enemies.

[3] Moreover, the Trading with the Enemy Act itself seems to have contemplated that debts of an enemy owing to and owned by a nonenemy would not become due merely because of the existence of a state of war. Under section 8a of the statute, any person not an enemy or ally of enemy, who is a party to any lawful contract with an enemy, * * * the terms of which provide for a termination thereof or for acceleration of maturity on presentation or demand, is authorized to terminate or mature such contract by notice or presentation or demand served or made on the Alien Property Custodian. When plaintiffs did not even elect to utilize the means thus given for accelerating the maturity date of their debt, they should not now, I think, be permitted to fix upon a maturity in advance of an actual demand.

[4] A slight analysis will, I think, easily establish the frailty of plaintiffs' further assertion that the quarterly statements of the bank should be regarded as accounts stated which imposed upon it the duty of making immediate payment of the balances shown, and that the failure to pay constituted a breach even though no demand was made. In the first place, plaintiffs themselves denominated the statements as being those of an "account current." It may next be said that while quarterly accounts were made up during the war period, none of them were actually rendered to plaintiffs until after the resumption of trade relations. The method of dealing between the parties prior to April 6, 1917, clearly indicates that the balances shown upon the statements were not payable to, nor desired by, the plaintiffs until such time as a demand should be made. Such, too, is the purport of the notation hereinbefore quoted, appearing upon the letters of transmittal accompanying each statement.

It is suggested that certain orders for payment out of the account, and which were issued by Zimmermann & Forshay within a few days of April 6, 1917, were dishonored so far as the pre-war accounts were concerned.

The record does not indicate which, if any, of the orders, other than those actually paid, were presented for payment before the restoration of communication between the United States and Germany upon July 19, 1919. Aside, therefore, from any question of restraint imposed upon the bank by German law during the continuance of hostilities, it is difficult to say that any of the orders were dishonored as of an earlier date. Plaintiffs, it is true, were required to open new accounts for such orders as were presented after trade was resumed; but they seem to have acquiesced in the failure of the bank to pay the orders from the old balances, and made no protest. But, assuming that the bank was then in default, it is all but impossible to ascertain the number and amount of outstanding orders presented for payment between July 19, 1919, and July 23, 1919.

The last-mentioned date is fixed upon, inasmuch as it marks the day upon which a communication, bearing the earmarks of a demand for the adjustment and settlement of the accounts between plaintiffs and

2 FEDERAL REPORTER, 2d SERIES

the bank, was dispatched to the latter. The bank was asked to send plaintiffs' "account current January 1st sixteen to date." This was apparently regarded as little short of a demand, inasmuch as the answer reads: "Shipment securities and disposal old balance about four million eight hundred thirty nine thousand impossible at present consequence peace conditions." Then it was that a proposal was made to the bank that it consent to the payment of the credit balances out of funds in the hands of the American Alien Property Custodian.

[5] Whatever may have gone before, the cable of August 9, 1919, definitely indicated that plaintiffs wished payment of the balances, and it should be treated as a demand. Although compliance with it could not then be made, owing to peace conditions, its date, for the purpose of this action, should be taken as the day upon which a breach occurred in the bank's obligations to pay. As such it should be held to be effective in fixing the time as of which the dollar value of plaintiffs' credits should be determined.

Confession is made that until a reargument of this case was had upon April 24, 1924, I was of opinion that December 17, 1921, when all restrictions placed upon the bank by German law were removed, should be chosen as the days of breach. Were this action in personam, I should adhere to that conclusion. But as the suit, in rem in its nature, is purely statutory, and as its maximum requirements are that a debt of the bank existing upon October 6, 1917, should be owing to and owned by the plaintiffs, and that such debt should have matured, it seems as though the bank should not be heard to plead, as a defense, the restrictive provisions of German law as they existed at the time a demand was made for payment of the debt. Unquestionably the demand was lawful so far as the plaintiffs were concerned—the bank could lawfully receive it—and even though compliance with it was illegal, the day of the debt's maturity had arrived. That day might have come long before, and without the knowledge of the bank, had plaintiffs chosen to elect an earlier date, and given due notice to the Custodian.

Assuming such action to have been taken, the inability of the bank to respond to the demand, by reason of the state of German law and royal decrees, or otherwise, would now be of no avail. The sequestered property and money would be subject to the payment of the debts as of the date of their maturity.

Under such circumstances, it would appear from sections 8a and 9 of the Trading with the Enemy Act (sections 3115½dd, 3115½e) that an alien enemy debtor is to be deemed in default upon the maturity of his debt, and without regard to the reasons for the default. Why then should the bank benefit and plaintiffs suffer through the continued fall of the mark in value, merely because the bank's debt was matured by a demand made upon the debtor rather than upon the Custodian? To this question there may be a valid answer, but, if so, it does not now occur to me.

[6] The question as to whether the exchange rate of the "breach day" or of the "judgment day" is to be used, in computing the amount of plaintiffs' recovery, was much argued at the bar. The matter has since been authoritatively settled by the recent ruling of the appellate court for this court in the case of Guiness v. Miller, where it was expressly held that the "breach day" rule obtains. The same case also disposes of the respective contentions of the parties with regard to sections 296 and 297 of the Treaty of Versailles.

Another matter in regard to this suit may here receive attention.

[7] Some weeks after the case was tried and submitted, the Deutsche Bank made a motion to be permitted to amend its already amended answer so as to file a set-off and counterclaim setting up an indebtedness on the part of the plaintiffs to it in the sum of $135,460.59, and to take proofs to establish any of the facts in connection therewith that may not be admitted by the plaintiffs.

It was alleged that for several years prior to June 20, 1923, the bank had maintained in New York an open running current account with the plaintiffs. From time to time deposits in dollars were made with plaintiffs, who also, upon occasion, collected from persons in New York money due to the bank. Upon June 20, 1923, a receiver of the assets of plaintiffs was appointed when a petition in bankruptcy was filed against them. Proceedings incident thereto are now in progress.

The existence of this alleged indebtedness was discovered by counsel for the bank when they came across a statement of the receiver that had been forwarded to the bank, of which counsel had not been advised. So far as appears, no part of the

indebtedness came into existence until after the war.

As previously indicated, a debt of an alien enemy, to be allowable under section 9 of the Trading with the Enemy Act, must have been owing to and owned by the claimant prior to October 6, 1917. Not only this, but the bank's claim upon its money and property in the hands of the Custodian of a value in excess of $10,000 has ceased to exist unless Congress shall enact further legislation. It is hardly to be supposed, therefore, that a claim of a nonenemy, as it existed upon October 6, 1917, and which cannot be increased by reason of later transactions, is to be offset or diminished by reason of credits established in favor of the former enemy and against the claimant as of a later date. To so hold would mean that so far as sequestered money and property are concerned, the claims of nonenemies are subject to limitations not imposed upon the enemies whose property was seized.

The motion for the suggested amendment was supplemented at the time of argument by an affidavit, in which it is claimed that, in addition to the sum of $135,460.59, the plaintiffs are further indebted to the bank to the extent of $14,624.11. This latter liability is said to have been in existence prior to April 6, 1917, but no showing is made as to what it represents or how it arose. Assuming the indebtedness can be established, I see no reason why the same should not be credited upon plaintiffs' recovery. Not only does justice to the bank require that this be done, but such a course should also be pursued for the benefit of other claimants of the bank against the money and property seized by the custodian as belonging to it. Conceivably, if the fund is not sufficient to satisfy all claims made against it, the claimants may be required to share pro rata.

The bank will be permitted to amend its answer to set up a counterclaim of $14,624.11, provided it does so within 10 days. If the same be put in issue by plaintiffs in their reply, the bank must be prepared to go to trial within 20 days thereafter.

### Supplemental Opinion.

[8] If it be, as I have held in my decision herein, dated April 25, 1924, that the debt of the Deutsche Bank owing to plaintiffs matured upon July 23, 1919, consistency requires that it should also be held that interest upon the debt runs from that date. Had plaintiffs made demand for the debt upon the Alien Property Custodian, instead of upon the bank, interest would have run from the time the demand was made. Section 8-a of the Trading With The Enemy Act provides that a demand (maturing a contract with an alien enemy) made upon the Custodian, shall have, in all respects, the same force and effect as if duly served or made upon the enemy personally.

This implies, I think, an effect that is without reference to the existence of a law of the enemy country, forbidding payment to one of our nationals.